## BURNETT v. MALONEY.

*(Knoxville.* November 14, 1896.)

1. CONSTITUTIONAL LAW. *Special Act authorizing a county to build a bridge, valid.*

A special Act authorizing and requiring a county to contract for the building of a public bridge, to issue bonds for that purpose, and to provide by taxation for the payment of interest thereon, and ultimately of the principal, is not invalid as vicious class legislation. *(Post. pp. 701–703.)*

Constitution construed: Art. XI., Sec. 8.

Act construed: Acts 1895, Ch. 80.

Cases cited and approved: Lauderdale County v. Fargason, 7 Lea, 153; State v. Wilson, 12 Lea, 246; Ballentine v. Pulaski, 15 Lea, 633; Williams v. Nashville, 89 Tenn., 487.

2. STATUTES. *Rules as to repeal of a special Act by a subsequent general Act.*

A later general law does not abrogate an earlier special one by mere implication. It is an established rule in the construction of statutes that a subsequent Act treating a subject in general terms, and not expressly interdicting the provisions of a prior special statute, is not to be considered as intended to affect the more particular and specific provisions of the earlier Act, unless it is absolutely necessary to so construe it in order to give its words any meaning at all. *(Post, pp. 703–706.)*

3. SAME. *Same. Case in judgment.*

The provisions of a general revenue Act, fixing the limit of the taxing power of the counties, does not repeal or modify, by implication, an earlier special Act authorizing a particular county to levy a tax to build a particular bridge, so as to render *ultra vires* and void a levy made under the special Act in excess of the limit prescribed by the general Act. *(Post, pp. 703–706.)*

Acts construed: Acts 1895, Ch. 4 (Ex. Ses.); Acts 1895, Ch. 80.

Burnett *v.* Maloney.

4. COUNTIES. *Powers and nature of, generally.*

Counties owe their creation to the statutes, and the statutes confer on them all the powers which they possess, prescribe all the duties they owe, and impose all the liabilities to which they are subject. Considered with respect to their powers, duties, and liabilities, they stand low down in the scale of corporate existence. They are ranked as *quasi* corporations. They possess no powers except such as are conferred expressly or by necessary implication, and these are strictly construed, and must be strictly pursued. (*Post, pp. 712–716.*)

Cases cited and approved: Railroad *v.* County, 1 Sneed, 681; Grant *v.* Lindsay, 11 Heis., 666; Taxpayers *v.* Railroad, 11 Lea, 334; Railroad *v.* Wilson County, 89 Tenn., 604; Colburn v. Railroad, 94 Tenn., 50; 7 Ohio St., 109; 63 Am. Dec., 345; 66 *Ib.*, 431.

5. SAME. *Power to issue bonds payable in gold.*

A county has not the power to make its bonds, principal or interest, "payable in United States gold coin of the present standard of weight and fineness," under a statute authorizing it to issue bonds of a specified amount, and to provide by taxation for payment, but not making any provision as to the kind of money in which either principal or interest shall be paid. (*Post, pp. 706–719.*)

Act construed: Acts 1895, Ch. 80.

Cases cited and approved: Taxpayers *v.* Railroad, 11 Lea, 334; Railroad *v.* County, 1 Sneed, 681; Grant *v.* Lindsay, 11 Heis., 666; Railroad *v.* Wilson County, 89 Tenn., 604; Colburn *v.* Railroad, 94 Tenn., 50; 7 Ohio St., 109; 63 Am. Dec., 345; 66 *Ib.*, 431.

Cited and distinguished: 60 Fed. Rep., 961; 23 S. E. Rep., 206; 3 Dillon, C. C. Rep., 197; Woods, U. S. C. C. Rep., 606; 87 Ala., 240 (S. C., 4 L. R. A., 742); 62 Ala., 389; 30 S. W. Rep., 17; 162 U. S., 292.

---

FROM KNOX.

---

Appeal in error from Circuit Court of Knox County. JOSEPH W. SNEED, J.

TRENT & FORD for Burnett.

COMFORT & SPILLMAN for Maloney.

WILKES, J.   The Legislature of this State, on April 30, 1895, passed an Act, entitled "An Act to authorize the County Court of Knox County to issue bonds of said county for building a bridge across the Tennessee River at the south end of Gay Street, Knoxville."   Chapter 80, p. 122, Acts 1895. The first section thereof authorized the Quarterly County Court of Knox County, three-fifths of its members concurring, to issue bonds of the county, not exceeding in the aggregate $225,000, and bearing a rate of interest not in excess of six per cent., for the accomplishment of the purpose indicated in the caption.   The second section provided that the interest on these bonds should be payable semi-annually, represented by coupons attached to each bond, and maturing at the proper date; and by the sixth section it was made the duty of the Quarterly County Court "to lay and levy a tax sufficient for the payment of the coupons of said bonds as they matured, and also to create a sinking fund for the retirement of the said bonds by the levy of an additional tax, sufficient to pay the principal of said bonds as they mature, which sinking fund shall be sacredly kept and applied for this purpose."

Acting under the authority of this statute, the Quarterly Court of Knox County, by a vote much larger than three-fifths of the whole Court, passed

a resolution authorizing the construction of the bridge contemplated therein, and subsequently entered into contract with the Youngstown Bridge Company to construct this bridge for the sum of $210,000. On the day of the closing of this contract, the County Court passed a resolution authorizing the defendant, Maloney, as County Judge and the County Clerk, to issue the bonds of the county in the amounts in the aggregate, and of the description found in the statute, the proceeds of which, when sold, were to be used for the erection of this bridge; and at the same time it levied a tax of five cents on the one hundred dollars on all taxable property in Knox County, for the purpose of meeting the interest on these bonds. Afterwards the Court passed a resolution directing the bonds to be made "payable in United States gold coin of the present standard of weight and fineness." All three resolutions were passed by the Court, three-fifths of its members concurring.

The present is an agreed case, made up under § 4187 *et seq.* of the (M. & V.) Code, by and between plaintiffs in error, who are citizens and taxpayers of Knox County, on the one hand, and the Judge of the County Court, the Clerk of that Court, and the County Trustee, by which certain matters of controversy between them, growing out of this Act of the Legislature and the proceedings of the County Court, were submitted to the determination of the Circuit Court of Knox County, in the sub-

Burnett *v.* Maloney.

mission the plaintiffs affirming and the defendants denying the following propositions:

(1) That the Act of the Legislature hereinbefore referred to is repugnant to Art. XI., Sec. 8, of the Constitution of this State, and therefore void.

(2) That the levy of the tax of five cents on the hundred dollars of taxable property, to pay the interest on these bonds, was unauthorized, because the Quarterly Court had previously exhausted its power to levy taxes for the year 1896, as that power was conferred by Chapter 4, same session of the Legislature of 1895.

(3) That, under this Act, the Quarterly Court had not the power to issue these bonds payable, principal and interest, in gold coin.

On the trial below, the Circuit Judge held the first two of these propositions against plaintiffs and the third against the defendants, and entered up a judgment in accordance with this holding. Both parties being dissatisfied, have appealed to this Court, and thus there is opened up for consideration all three of the propositions.

Is the Act in question obnoxious to the constitutional objections which plaintiffs make to it? These objections are, first, that it was passed for the benefit of Knox County alone, granting to it a right or power not extending to any other county; and, secondly, that it is an effort to increase the powers of this county by a special law, and it is assumed that they are sustained by Sec. 8 of Art. XI. of

our Constitution. So much of this section as affects the first of these objections is as follows, viz.: "The Legislature shall have no power to suspend any general law for the benefit of any particular individual, . . . nor to pass any laws granting to any individual or individuals rights, privileges, immunities, or exemptions other than such as may be, by the same law, extended to any member of the community who may be able to bring himself within the provisions of such law." This provision, as set out above, corresponds exactly with Sec. 7 of Art. XI. of the Constitution of 1834, save that the latter has this as a concluding clause: "Provided always, the Legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good."

In the room and stead of this proviso found in the Constitution of 1834, the second clause of Sec. 8 of Article XI. of our present Constitution is as follows: "No corporation shall be created, or its powers increased or diminished, by special laws; but the General Assembly shall provide, by general laws, for the organization of all corporations hereafter created," etc.

The objection here raised has been set at rest by this Court, and against the contention of the plaintiffs. In the case of *Lauderdale County* v. *Fargason*, 7 Lea, 153, it was considered and determined, the Court saying: "It has never been contended by anyone that a municipal corporation could not be

authorized by a special law to make contracts and levy taxes to meet them." So it was held in that case that certain Acts of the Legislature, providing that the County Court of any County through which the line of the Mississippi River Railroad was proposed to be run, might, under certain conditions, subscribe to the capital stock of the company, were not amenable to Sec. 7 of Art. XI. of the Constitution of 1834. This decision has never been disturbed by any subsequent holding. On the contrary, if not by direct reference, yet by necessary implication, it was approved in the case of *Williams* v. *Nashville*, 5 Pick., 487, arising under the present Constitution.

The second of these objections going to the unconstitutionality of this Act is disposed of in *State* v. *Wilson*, 12 Lea, 246; *Ballentine* v. *The Mayor*, 15 Lea, 633, and *Williams* v. *Nashville*, *supra*.

2. We think that the second assignment of error, on the trial Judge's holding that the Quarterly Court properly exercised its power in levying the tax of five cents to meet the interest on these bonds, equally untenable. We have already set out the sixth section of Ch. 80 of the Acts of 1895, under which this special tax was levied.

The agreed case shows that at the January term, 1896, this Court had levied property taxes for various purposes for the year 1896, amounting to seventy-nine cents on the hundred dollars.

It will be remembered that these bonds were authorized, and this tax was directed, by an Act passed

at the regular legislative session of 1895. Subsequently, and at an extra session of the same Legislature, a general revenue bill was passed (Ch. 4, p. 579), by the second section of which the counties of the State were limited in the levy of a county tax to a rate not exceeding thirty cents on the one hundred dollars of taxable property, "exclusive of the tax for public roads and schools, and interest on the county debt, except as hereinafter otherwise provided." Section 14 of the same Act is as follows: "*Be it further enacted,* That the aggregate amount of special taxes levied by counties shall not exceed the amount limited to them for current expenses." The contention now is that the effect of this general statute is to fix a limit to the taxing power of the county, and as the agreed case shows that this had already been reached at the date of the levy of the tax as provided for in Ch. 80 of the special Act in question, the action of the County Court in making such levy was *ultra vires* and void. We do not think so. The power to issue these bonds and the duty to levy this tax to meet the interest on them, were correlative in character. The Act makes them inseparable. The duty to pay this interest, as it matures, is no more a part of the obligation of the contract than the duty to provide the means of paying it by the exercise of this especially provided taxing power. Knowing that the value of the bonds in the markets of the world depended upon the existence of carefully guarded stat-

utory provisions for the levy of taxes to meet both principal and interest, it is inconceivable that the Legislature would, while leaving the Act authorizing the issuance of the bonds on the statute books, yet, by indirection, take from it that which gave it its only vital force.

In addition, however, sound and well-settled rules of statutory construction are opposed to this insistence. The purpose of Sec. 6 of Ch. 80 was special. It was to give Knox County the right, and to make it its duty, to levy a tax for the purpose of providing a fund to meet the interest on these bonds, and this without regard to its right or duty with respect to other taxes. The revenue Act, on the other hand, was general in its character, and its provisions relate to and govern the general powers of taxation of all the counties of the State. It will not be presumed that this subsequent general legislation, in the absence of reference to it, was intended to either repeal or qualify the power of taxation given in, and essential to the integrity of, this special Act. "A later general law does not abrogate an earlier special one by mere implication. It is usually presumed to have only general cases in view, and not particular cases, which have already been provided for by the special Act." Endl. on Interp. of Stat., Sec. 223. Or, as is said by the author in Black on the Interp. of Laws, p. 116: "It has come to be an established rule, in the construction of statutes, that a subsequent Act treating a subject

13 P—45

in general terms, and not expressly interdicting the provisions of a prior special statute, is not to be considered as intended to affect the more particular and specific provisions of the earlier Act, unless it is absolutely necessary so to construe it in order to give its words any meaning at all. This rule is founded upon, or expressed by, the maxim, *Generalia specialibus non derogant.*"

3. The defendants assigned for error so much of the judgment of the trial Judge as held that the County Court of Knox County lacked power, under Chapter 80, to issue its bonds payable in gold. While this Act defines many of the features of the bonds to be issued under it, and limits their aggregate amount to $225,000, it does not prescribe the kind of money in which the bonds and interest coupons are to be paid. The Quarterly Court directed that principal and interest be made payable in gold coin of the present standard of weight and fineness, and from this feature the principal contention in this case arises.

We have been cited by counsel to some cases claimed to bear upon the subject. The first is the case of *Moore* v. *Walla Walla*, 60 Fed. Rep., 961. The report of this case is quite meager, but the Court uses this language: "I hold that the authority given by the laws of the State to municipal corporations, to provide means for constructing works of public utility by issuing and selling negotiable bonds, includes authority to redeem such bonds in

money of equal value to that which they shall have received." It is apparent from this statement that the general laws of the State gave municipal corporations authority to issue bonds, but under what restrictions or limitations does not appear. It is fairly inferable from the statement that the city of Walla Walla was authorized to issue bonds, and did issue bonds payable in gold, and sold them for gold, in order to obtain the funds necessary to make the improvements.

The next case is that of *Heilburn* v. *Mayor, etc., of Cuthbert, Ga.*, decided April, 1895, and reported in 23 S. E. Rep., 206. In this case, by the charter of the city, the mayor and council were given authority to do all things necessary for the benefit of the city, and all things not in violation of the Constitution and laws of the State. It was very appropriately said by the Court that the "general welfare" clause in this charter was very broad and liberal in its terms. The Court, in passing upon the question now under consideration, in view of this charter, said: "No reason now occurs to us, nor was any stated, why it would be unlawful to make the proposed bonds payable in gold or lawful money of the United States, at the option of the holder." This is the only deliverance given upon the subject. It is evident the question was not seriously considered in the case, and was allowed to go by default.

The case of *Pollard* v. *The City of Pleasant Hill*,

3 Dillon, Circuit Court Reports, 197, is also cited and relied on.    In that case the bonds were payable in legal tender notes - and the interest coupons were payable in gold coin.    The bonds were issued in payment of a subscription to the Pacific Railroad of Missouri.    The bonds were in the hands of an innocent holder for value before maturity of the coupons sued on.    The Court held that the matter was one purely of contract, and when its terms appeared the Court would enforce it.    What the provisions of the charter of the city of Pleasant Hill were, or what the provisions of the general law, does not appear.    The decision was rendered in 1874.

The next case is that of *Young* v. *The Montgomery & Eufaula Railroad Co.*, Woods, U. S. Cir. Ct. Rep., p. 606.    In this case the Governor of the State of Alabama indorsed the first mortgage bonds of the railroad company, and the Court held that the Act of the General Assembly authorized the indorsement of bonds bearing interest at the rate of eight per cent. per annum, and that the fair construction was that it meant eight per cent. in any legal tender currency on which the parties might agree.    It is well to note that this case does not involve the power or right of a city or county to make such agreement, but the act done and liability incurred was that of the State.

None of these cases were decided by Courts of last resort, except the Georgia case, and in none of them was the matter fully presented and passed upon.

The case of *Judson* v. *Bessemer*, 87 Ala., 240 (S. C., 4 L. R. A., 742), is also relied on. In that case there was a provision authorizing the city of Bessemer to issue bonds for municipal purposes, and it was held that a general power given the city to issue negotiable bonds, in the absence of any legislative restriction, carries the implied power to make them payable in currency which is constitutionally a legal tender, as in gold coin. The Court held that, under the rulings of the Courts in that State, corporations having power to issue securities might exercise such power in the same mode and manner as natural persons may under similar circumstances, there being no legislative restriction nor specifications of a particular mode. Citing *University of Ala.* v. *Moody*, 62 Ala., 389. It is distinctly stated in this case that the city had express and general power to issue bonds, and under such express power the city of Bessemer had authority to make them payable in gold.

The case of *Farson, Leach & Co.* v. *The Board of Commissioners*, decided by the Court of Appeals of Kentucky, reported in 30 S. W. Rep., 17, is also cited and relied upon. This was a case where the city of Louisville issued its bonds, payable, principal and interest, in gold coin. The Act authorizing their issuance did not specify in what currency they were to be made payable. The Court quote approvingly the Alabama case above cited, as well as the other cases cited, and lay down the doctrine that powers

must be implied such as are incidental to the powers expressly granted, and that the city must be granted discretion, and would not be restricted to the actual powers granted strictly construed. The Court treated the matter of the kind of currency as simply one of contract, and at the discretion of the maker or borrower.

The case of *Woodruff* v. *Mississippi*, reported in 162 U. S. Rep., 292, should also be noticed. It was a case of levee bonds issued under Act of the Legislature of Mississippi by a levee board, which was a body corporate under the laws of that State. The authority given to that board was to issue bonds to be sold in the market, the proceeds to be used in building levees against the Mississippi River. The bond issued was in somewhat peculiar form, and uses this language: The levee board "hereby acknowledges themselves indebted to bearer in the sum of one thousand dollars in gold coin of the United States." But it contained no express promise to pay the amount in gold or any other special currency. The coupons, however, stipulated to pay the bearer twenty dollars in currency of the United States, being the semiannual interest. The Supreme Court of Mississippi held that the bonds were payable in gold coin, and that the Board of Levee Commissioners had no power or authority to make them so payable, and that they were void. The Supreme Court of the United States, Chief Justice Fuller delivering the opinion, held that, upon a

proper construction of the language of the bond, it could not be held that it was payable only in gold; that the bonds were not expressly payable in gold coin. The Court continues: "It is true that, as they acknowledged an indebtedness in gold coin, and as the coupons were payable in currency, the argument is not unreasonable that the corporation intended the purchasers to expect payment in the money in which the indebtedness was stated to have been contracted, but the agreement to pay the designated sums did not specify any particular kind of money, and the obligation was to pay what the law recognized as money when the payment was to be made. The bonds were therefore legally solvable in the money of the United States, whatever its description, and not in any particular kind of that money, and it is impossible to hold that they were void because of want of power." That the decision in this case rested upon the ground that the bonds were payable in any legal currency, and not alone in gold, though the bond acknowledged an indebtedness in gold, clearly appears throughout the entire case, and Judges Peckham, Brewer, and White were of opinion the holding of the Supreme Court of Mississippi was a finality upon this point, and the case presented, therefore, no question of Federal jurisdiction.

The resolution of the County Court in regard to the bonds in controversy, allows no latitude for construction. It provides that both the principal and

interest of the bonds shall be payable in gold coin of the United States of the present standard of weight and fineness. The form of the bond and coupon is also prescribed, and there is an express promise, in no equivocal language, to pay both bond and interest coupon in gold coined money of the United States of the present standard of weight and fineness. There is, as will be seen, no latitude for holding that if the standard of the gold coin of the United States should hereafter be changed, the county could get the benefit of it, but the identical gold now coined, of the present weight and fineness, must be paid, even if the Government should change its standard and no longer issue coins of the present weight and fineness.

It is proper to call attention to the fact that all of the cases · cited involve bonds issued by municipal corporations, except one in which the power and liability of a State is involved, but none of them involve bonds issued by counties.

That there is a wide difference between the powers of municipal and county corporations, under similar Acts of the Legislature, is well supported by reason and authority. In the case of *Soper* v. *Henry County* (Sup. Ct. Iowa), Am. Corporation Cases, Vol. II., p. 334, Dillon, Judge, author of the noted work on Municipal Corporations, said: " Counties owe their creation to the statutes, and the statutes confer on them all the powers which they possess, prescribe all the duties they owe, and impress all the

liabilities to which they are subject. Considered
with respect to their powers, duties, and liabilities,
they stand low down in the scale of corporate ex-
istence. For this reason they are ranked among
what are styled *quasi* corporations. This designation
is employed to distinguish them from private cor-
porations aggregate and from municipal corporations
proper, such as cities acting under general or special
charters more amply endowed with corporate life and
functions, conferred in general at the request of the
inhabitants of the municipality, for their peculiar and
special advantage and convenience. The decisions of
the Courts of every State in the Union, recognizing
this distinction, hold incorporated towns and cities to
a much more extended liability, and give them more
extended power and discretion, than they do counties."

In his work on Municipal Corporations he says,
Vol. I., Sec. 509, p. 596 (4th Ed.): "In respect to
municipal or chartered corporations, our opinion is
that they have no power whatever except so far as
conferred expressly or by fair implication. This is
an important principle, and it results therefrom that
there are no presumptions in favor of *quasi* corpo-
rations."

In 4 Am. & Eng. Enc. L., p. 382, it is said
counties cannot borrow money, issue bonds or nego-
tiable paper, except when and in the manner they
may be specially authorized so to do. A county has
been defined to be a local organization, which, for
the purpose of civil administration, is invested with

a few functions of corporate existence. *Hamilton Co.*
v. *Mighels*, 7 Ohio St., 109.

It is again said: "Counties being merely parts of
the State government, they partake of the State's im-
munity from liability. The State is not liable except
by its own consent, and so the county is exempt
from liability unless the State has consented. Counties
are not liable to implied common law liabilities as
municipal corporations are." *Browning* v. *Springfield*,
63 Am. Dec., 345; *Perry* v. *Worcester*, 66 Am. Dec.,
431.

Counties do not hold and operate under charters, as
do cities and other municipal corporations. They have
no franchises. They make, and can make, no by-
laws. They have the same powers and duties
throughout the State. They do not have to provide
waterworks and fire departments and lights, and the
hundred and one necessaries for cities and towns.
Their ordinary expenses are met by issuance of
county warrants, payable out of a general fund col-
lected for all purposes. The occasions for extra-
ordinary expenditures are few, such as the building
of jails, courthouses, bridges, and hospitals, and if
it becomes necessary to incur a debt for these pur-
poses which cannot be at once met out of the usual
revenues, they must get their authority to create such
debts from an enabling Act of the Legislature, which
at the same time gives them the power to provide
for its payment by a special tax, and no doctrine
is better settled in this State than that the power

Burnett *v.* Maloney.

thus conferred must be strictly construed and exactly followed.

In *Taxpayers of Milan* v. *Railroad,* 11 Lea, 334, it is held that a County Court cannot issue bonds unless authorized so to · do, and then only in the manner and form authorized. It is further held that the power to issue bonds and incur extraordinary debts can only be derived in the way pointed out in the Constitution and laws of the State, and the powers thus conferred must be strictly construed and clearly followed. ˉSee, also, *L. & N. R. R. Co.* v. *County Court,* 1 Sneed, 681; *Grant* v. *Lindsay,* 11 Heis., 666; *Taxpayers* v. *Railroad,* 11 Lea, 334; *Railroad* v. *Wilson County,* 5 Pick., 604; *Colburn* v. *Railroad,* 10 Pick., 50. And this is the general trend of authorities.

Thus, it is said the statute authorizing a county contract must be strictly pursued, or the contract will not bind the county, and the requirement of the statute must be fulfilled, and a contract, unless made pursuant to statutory authority, will not bind, and a contract *ultra vires* may always be defended against. 4 Am. & Eng. Enc. L., 359. and note. As an illustration, in *Skinner* v. *Santa Rosa,* it was held that when the statute provides that bonds may be made payable in gold coin or lawful money of the United States, theyˉ cannot be made payable in gold coin of the United States of the present standard of weight and fineness. 29 L. R. A., 512.

It has been tersely said "the limits of all powers

of counties, except those necessarily implied, must be found within the four corners of the statutory provision made by the Legislature." 4 Am. & Eng. Enc. L., 389.

The cases cited from Kentucky, Alabama, and Georgia clearly show that in those States the rule of liberal construction prevails, but such does not apply in Tennessee, nor generally, and certainly does not apply to county or other *quasi* corporations. It may be granted that individuals and private corporations aggregate may make contracts to pay in gold, and it has been so held in this State (*Mills* v. *Allison,* 4 Heis., 386), but it by no means follows that county corporations have the same power.

As an original proposition it may well be doubted whether it is consonant with the highest and broadest public policy to allow individuals to make gold contracts, but this question we are not called upon to consider. We are of opinion there is neither express nor implied authority conferred by the Act in controversy in this case to make the bonds of the county payable, either principal or interest, in gold coin of the present weight and fineness. The Act providing for the issuance of bonds also provides for a special tax for the payment of the bonds, principal and interest. Obviously, the Act contemplates that the bonds and the special tax shall be paid in the same money, for both are authorized in the same Act in similar language and without distinction as to the money to be raised in the one

case and paid out in the other. The Act affords no more authority for the issuance of gold bonds than for the assessment and collection of special gold tax for their payment.

It certainly cannot be insisted that gold can be collected from the taxpayer to meet the payments as they fall due, and yet this power may as well be implied as that of making the bonds payable in gold. Where can the gold be had unless collected from the taxpayers? The theory of the law is that the fund collected to pay upon these bonds shall be kept separate and apart from all other funds, and a special tax is authorized and provided for that purpose by the same Act which provides for the bonds. While the identical money received may not be kept intact and paid in kind, still the county can only demand from the banks and other custodians of the fund, money similar to that collected and deposited. It will then become necessary for the county authorities to go into the market and buy the gold required to meet the payments. It matters not whether gold is at a premium or at par or at a discount. In any event there must be an exchange of funds collected in order to secure it. There is no authority, under the statute or elsewhere, for the county officials to make such exchange. In the contingency that gold may go to a premium, the county must suffer the burden of obtaining it. It is said that the policy of the general government is to keep all legal tender funds at the same value, and that we cannot pre-

sume the different kind of legal tender money will ever have different values. But evidently this is exactly the contingency that prompts the gold feature in the bonds. Unless there were some advantage to the purchaser or holder of the bonds in having them payable in gold, then there would have been no occasion for the gold feature. It is apparent that if an advantage accrues to the bondholder because of this provision, it follows inevitably that such an advantage is gained at the expense of the county and taxpayer. It is evident, also, that while the general policy of the government may be to-day to keep all of its legal tender money at par and of the same value, such may not be its policy next year, or five years or ten years from now, while the bond is still outstanding. If gold should go to a considerable premium, it would increase the burden of the taxpayer. If Knox County can make her bonds payable in gold, so can every other county in the State or in the United States, and then gold would become the only solvable currency in such transactions, contrary to the general policy of the government and to the broadest public interest.

In this case not only is it provided that the bond, principal and interest, shall be payable in gold, but it must be gold of the present standard of weight and fineness. If, therefore, the government shall change its standard and cease to coin its gold of the present standard of weight and fineness, yet, the county must still comply with its bond, and obtain,

Burnett *v.* Maloney.

as best it can and at its own expense, gold coin of the present standard of weight and fineness.

It is said the right to pay in legal tender involves the right to pay in any money that is legal tender, and, gold possessing that quality, can be stipulated for; but the error in this is that requiring payment in gold, and in gold alone, deprives the debtor of the right to pay in other legal tender, and compels him to pay in one thing, discriminating against the others, and thus subjecting the debtor to the danger of being placed in a position of embarrassment and peril.

The judgment of the Court below is affirmed, with costs.

### DISSENTING OPINION.

BEARD, J. Not being able to concur with the majority in their conclusion that under the Act of 1895 the county lacked the power to issue its bonds payable in "gold coin of the United States of the present standard of weight and fineness," I think it proper to state, very briefly, the reasons of my dissent. It is true, as is said in the majority opinion, this Act "fixes many of the features of the bonds which it authorizes the county to issue, and limits their amount to $225,000, yet it does not prescribe the kind of dollars" in which they may be made payable. This seems to have been left to

the discretion of the County Court, the Legislature no doubt assuming that it would be exercised with an eye to the best interest of the public. No satisfactory reason has been suggested why this was not a proper and legal exercise of this discretion by that body in the selection of gold as the money in which these bonds and the interest upon them were solvable. Gold is a part of the circulating medium of business, and, with silver and United States notes, constitutes the legal tender money of the country. So that if these securities were issued payable in "dollars" generally, there is no doubt but the county would have the right to pay, and the creditor would be bound to accept, either of these three kinds of money so tendered to him. That an individual may legally obligate himself to pay his creditor in gold is unquestionable, and we can see no reason why the county of Knox, in the absence of legislative inhibition, and under the terms of this Act, may not bind itself to do the same. This is a question of power and not of policy. But, if it was the latter, yet, as it has been the declared policy of the United States Government, since the resumption of specie payment in 1878, to maintain at an equality all of the various kinds of money—gold, silver, and legal tender notes—it could not be assumed by the Courts that this policy would be reversed so as to bring about a difference in the value in these various kinds of money. The diligence of able counsel, aided by the investigation of

the Court, has been able to discover only a few cases involving this question. In these, however, the holding of the Courts have been in accord with the view already indicated.

In *Judson* v. *Bessemer*, 87 Ala., 240 (S. C., 4 L. R. A., 742), it is held that a power to make city bonds payable in gold is included in the general power to issue them, as this implies the right to make them payable in any constitutional legal tender. In *Moore* v. *Walla Walla*, 60 Fed. Rep., 961, it was held that, under municipal authority to issue and sell negotiable bonds, they could be made payable "in gold coin of the present standard of weight and fineness." Where the Governor was authorized to indorse railroad bonds on behalf of the State, it was held that he might lawfully indorse such bonds with interest payable in gold. *Young* v. *Montgomery*, 2 Woods' C. C., 606. In a suit to enjoin the issuance of municipal bonds "payable in gold or lawful money of the United States, at the option of the holder," it was said by the Supreme Court of Georgia, "No reason now occurs to us, nor was any stated, why it would be unlawful" to make the proposed bonds so payable. *Heilburn* v. *Cuthbert*, 23 S. E. Rep., 206 (1895).

In *Farson* v. *Board of Commissioners* (Kentucky, 1895), 30 S. W. R., 17, it was insisted that municipal bonds were void because payable in gold coin of the United States, while the Act under which they were issued was silent as to the character of

13 P—46

the money in which they might be discharged. To this the Court of Appeals said: "These bonds are to be offered on a market in which there is current more than one circulating medium, but one which is regarded more stable and less subject to fluctuation than any other, which is the recognized standard of value, and which is the equivalent of and corresponds in value with that which the borrower is to receive from its bonds. Can there be any legal reason why the borrower, in case it should seem, in the exercise of sound discretion, both prudent and advantageous to stipulate for the payment of the loan in a particular medium of circulation,   .   .   . should not be allowed to so contract? It seems not to us."

In *Skinner* v. *Santa Rosa* (Cal.), 29 L. R. A., 512, while the Court avoided the bonds in question in that case on account of an amendatory Act passed by the Legislature of California in 1893, they held that, prior to that Act, "the power to make bonds payable in gold coin of the present standard of weight and fineness, or in any other kind of coin or currency, could not be controverted.   .   .   .   The power to determine that question was as ample as that of a natural person to stipulate in what his personal obligations should be paid."

In *Woodruff* v. *State of Mississippi*, 162 U. S., while the question upon which that case turned was jurisdictional, yet, the one now being discussed was, to some extent, involved, and the majority opinion

quotes fully and approvingly from the Alabama and Kentucky cases already referred to, and I do not think there can be any error in assuming that the whole argument of that opinion, on this point, is in accord with those cases.

The force of these concurring opinions cannot be broken by the suggestion that we are not in possession of the statutes and constitutions prevailing in the jurisdiction where these cases arose. The Courts which have met and decided this question have not appealed to any provision of the charter of the municipal corporations claiming the right to issue gold bonds, or to any constitutional provisions peculiar to the particular State, but they have rested their decisions on the broader and more satisfactory ground that the legislative authority to pay in "dollars" generally—that is, in all kinds of legal tender money —includes the right to pay in any one kind of such money. Not a single case involving this special question has been found as authority for the majority opinion, and in the face of these decisions, I submit that this Court should not place itself in a state of judicial isolation, unless forced into it by the stress of a strong, if not irresistible, logical necessity, and this, I respectfully suggest, does not exist in this case.

But it was said in argument, and we understand it to be the opinion of the majority of the Court, that even if the grant in question had been to a municipal corporation (as was the fact in several of

the cases already cited), yet it would hardly, if at all, be sufficient to authorize the issuance of gold bonds, and that, *a fortiori*, it will not warrant the county in placing such bonds on the market. This is upon the idea universally admitted, that, while the former is a corporation proper, the latter is less than such a corporation—that is, it is a public *quasi* corporation. Without consuming time in pursuing the authorities, which so clearly and uniformly draw the line between the two, I think a single suggestion disposes of this objection. Both a county and a municipal corporation, when they propose to issue negotiable securities, payable *in futuro*, and likely to pass into the hands of purchasers, who will seek to rely upon a *bona fide* title to cut off all equities, must be prepared to point out the Legislative Act granting such power, either in express terms or by necessary implication. One no more than the other has the inherent power to bind itself by an issue of negotiable bonds. The full fledged municipal corporations must appeal to the Legislature for this authority, quite as earnestly as this body, called a public *quasi* corporation. If it be that both must look to the same source for their authorization in this regard, then whenever either claims that it is within the provisions of an Act of the Legislature, in the exercise of such a power, the Courts will, of necessity, apply the same rules of construction in the one case as in the other.

This proposition is so elementary that it requires no citation of cases to support it.

Nor do I at all agree that to hold that the county, under this legislative grant of authority, can issue its bonds solvable in gold, involves the necessity of holding that the county, to meet these bonds and the maturing coupons, could levy a tax on the property of its citizens payable specially in gold. The bonds can be made payable in gold only because the Act authorizes their issuance payable in "dollars," and this generic term includes gold, as well as all other kinds of United States money; but the Act does not direct a tax to be levied collectible in "dollars." Should these bonds be issued, their holders would stand on their contract rights, and could insist upon payment in gold in accordance with the terms of their bonds. But the taxpayer would stand in no contractual relation with either these bondholders or the county; his obligation to pay his proportionate part of the tax levied to meet these bonds and interest, would rest alone in the statute; it would grow out of the duty imposed upon the county to provide for the payment of their bonds and coupons by the levy of a tax. As to this, the authority given is coextensive with the duty imposed, and that is "to lay and levy a tax sufficient for the payment of the coupons of said bonds as they mature, and also to create a sinking fund," etc. The county is to levy this special tax, but it is to be laid upon the citizens, as it lays all other taxes collectible in

any of the legal tender funds of the United States. There is not a single word in section six of this Act —where alone is the taxing power found—that, by any rule of interpretation accepted by the Courts, will warrant the contention that this county, in performing this duty, would have any other or different power from that which it has in levying and collecting any other tax. In this, as in all other cases, the tax would be levied and collected in the money of the country, the citizen paying his proportion in any kind or species of that money which he might select. And the objection that has been made that the time may come, before the maturity of these bonds, when, these taxes having been paid in the ordinary currency of the country, the county might find itself compelled to go into the market to buy gold to meet its maturing obligations, goes not to the question of a proper interpretation of the statute, but to that of expediency, and, as such, is of no force, unless it be that the government should change a policy fixed with the resumption of specie payment, as has been before stated, and this we do not think a Court is authorized to assume.

Entertaining these views, I cannot agree with the majority. I am authorized to say that Chief Justice Snodgrass concurs with me in this dissent.