*RED RIVER FURNACE COMPANY *et al.* *v.* TENNESSEE
CENTRAL RAILROAD COMPANY *et al.*

(*Nashville.* December Term, 1903.)'

1. **ELECTIONS.** Commissioners of registration styling themsel-
   ves "commissioners of election," in notice of election, does
   not invalidate the election.
   The fact that commissioners of registration styled themselves
   "commissioners of election," in the statutory notice calling and
   advertising a special election for the purpose of determining
   whether or not the city should subscribe for so much stock in
   a certain railroad, was a mere clerical error, not misleading,
   and insufficient to invalidate the election. (*Post, pp.* 706-708.)

2. **SAME.** Irregularities cured by validating statute.
   The irregularities of opening of polls at only two of the three pol-
   ling places in a city at an election to determine whether or not
   the city should subscribe for so much stock in a certain rail-
   road, of calling an election by resolution of the city council
   instead of by ordinance; of the rejection of certain ballots cast
   without any reason being given by the officers of the election;
   and of ballots not of proper form, were cured by a statute (Acts
   1903, ch. 276) validating such election. (*Post, pp.* 707-709.)

   Acts cited and construed: 1903, ch. 276.

3. **SAME.** Carried by bribery and disqualified voters cannot be
   validated by legislature.
   The legislature has no power to pass an act validating an elec-
   tion carried by bribery, by corrupt use of money, and by the

*This opinion was filed too late tó be published with the other
opinions delivered during the December Term, 1903.—Reporter.

, Furnace Co. v. Railroad.

votes of persons rendered infamous by judgments of courts of competent jurisdiction. (*Post, pp.* 708, 709, 710.)

Constitution cited and construed: Art. 4, sec. 1, last clause.

4. **SAME.** Bill charging eighty-eight votes rejected by judges of election, without more, is insufficient to show illegality.

A bill attacking an election, charging that eighty-eight of the ballots cast were rejected by the judges of the election, is insufficient to show illegality, in the absence of a further allegation that these were ballots of qualified voters, or that the judges violated some legal duty in rejecting them. (*Post, p.* 712.)

5. **SAME.** Requisites of bill attacking election for bribery, corruption, and votes cast by persons disqualified by infamous crimes.

A bill alleging that in a city election, held to determine whether or not the city should subscribe for so much stock in a certain railroad, six hundred and eighty-one votes were cast for, and two hundred and twenty-three against the subscription, and that eighty-eight of the votes cast were thrown out by the judges as illegal, that complainants are informed, and therefore charge, that the representatives and agents of the railroad company gave money to seven named persons, and paid their poll taxes, in consideration of their votes, and that nine other persons who voted for the subscription, prior to the election had been convicted of infamous crimes and rendered infamous, is insufficient without more and specific allegation as to the conviction of such infamous persons, and without an allegation showing that such illegal votes were not a part of the eighty-eight votes that were rejected, and that they formed an essential part to the constitutional total cast in favor of the subscription. (*Post, pp.* 713-715.)

Cases cited and approved: Fort v. Orndoff, 7 Heis., 167; Winham v. Crutcher, 2 Tenn. Chy., 535; Raht v. Mining Co., 5 Lea, 1; Crockett v. McLanahan, 109 Tenn., 517; Marquez v. Frisbie, 101 U. S., 473.

Furnace Co. v. Railroad.

6. **MUNICIPAL CORPORATIONS.** Subscription for stock in a railroad, authorized by resolution directing mayor to make same, is not complete until made by the mayor.

A city's subscription for stock in a railroad is not binding by an ordinance or resolution making effective the vote cast at a popular election held to determine whether or not the city should subscribe for stock in a railroad, and directing the mayor to subscribe, in its name and for its benefit, for the stock in the railroad, but such subscription is only complete when made by the mayor and the time within which the railroad was bound to complete its line to the city from the date of the subscription began to run from the date of the mayor's subscription, and not from the date of the passage of said ordinance or resolution. (*Post, pp.* 715-719.)

Cases cited and approved: Nugent v. Supervisors, 19 Wall., 241; Moultrie v. Bank, 92 U. S., 631; Bates v. Winters, 97 U. S., 83. Case cited, distinguished, and approved: Nelson v. Haywood Co., 87 Tenn., 781.

7. **SAME.** Submission of indivisible proposition for subscription and mode and terms of payment for stock in railroad.

Where the notice of the commissioners of registration of a city election to determine whether or not the city should subscribe for stock in a railroad had attached thereto as a part of it a copy of the proposition, for the information of the voters, which contained both the question of the subscription and the mode and terms of payment thereof, the submission was that of an indivisible proposition including both the question of subscription and the mode and terms of payment. (*Post, pp.* 719-720.)

Act cited and construed: 1887, ch. 3.

8. **SAME.** Payment of subscription for stock in railroad does not constitute a lending of the city's credit.

The payment of a city's subscription to the stock of a railroad does not constitute a lending of the city's credit within the sense of the constitution; and, therefore, there is no constitu-

Furnace Co. v. Railroad.

tional necessity for submitting to popular election the question of the mode or manner of the payment of the city's subscription constitutionally and validly made for the stock of the railroad. (*Post, p.* 720.)

Case cited and approved: Johnson City v. Railroad, 100 Tenn., 138.

Constitution construed, but not cited: Art. 2, sec. 29.

9. SAME. Special legislation affecting, not prohibited by constitution.
Special legislation as to municipal corporations is not prohibited by the constitution. (*Post, pp.* 722, 623.)

Acts cited and construed: 1887, ch. 3; 1890 (ex. ses.), ch. 24; 1903, ch. 276.

Constitution cited and construed: Art. 11, sec. 8.

Cases cited and approved: State v. Wilson, 12 Lea, 246; Ballentine v. Pulaski, 15 Lea, 636; Williams v. Nashville, 89 Tenn., 487; Reelfoot Lake Levee District v. Dawson, 97 Tenn., 151; Burnett v. Maloney, 97 Tenn., 697; Davis v. Rogersville, 107 Tenn., 588; Redistricting Cases, 111 Tenn., 234.

10. SAME. Statute ratifying and curing defects in subscription to stock in railroad is constitutional, when.
A statute (Acts 1903, ch. 276) ratifying and curing defects in a subscription made by the city of Clarksville for stock in a certain railroad is not unconstitutional as partial law, suspending for the benefit of said city the general law for subscription for stock in railroads by cities. (*Post, pp.* 723-725.)

Acts cited and construed: 1851-52, ch. 117; 1866-67 (private), ch. 48, sec. 6; 1867-68 (private), ch. 6; 1887, ch. 3; 1903, ch. 276.

Case cited and approved: Lauderdale Co. v. Fargason, 7 Lea, 153.

Furnace Co. v. Railroad.

11. **SAME.** Statute validating subscription for stock in railroad and authorizing bonds for the payment thereof embraces but one subject, and is constitutional.

A statute (Acts 1903, ch. 276) validating and approving the subscription for stock in a certain railroad made by the city of Clarksville, and authorizing the issuance of bonds by the city to be used to pay such subscription, and providing for the payment of such bonds, is not invalid as embracing more than one subject, and is not contrary to the constitution. (*Post, pp.* 725-730.)

Acts cited and construed: 1887, ch. 3, sec. 12; 1903, ch. 276.

Constitution cited and construed: Art. 2, sec. 17.

Case cited and approved: Ryan v. Terminal Co., 102 Tenn., 111.

12. **SAME.** Special statute authorizing issuance of bonds to pay subscription for stock in a railroad without limiting maturity of bonds is in pari materia with Acts 1887, ch. 3, limiting maturity at twenty years.

A statute validating the election and approving of a city's subscription for stock in a railroad, and providing for the issuance of bonds to be used in payment of the subscription, does not confer a new power on the city in that it authorizes the issuance of bonds for a longer term than twenty years by a mere resolution of the municipal board, when one of the terms of the proposition voted on was that the payment should be made in twenty year bonds, because this curative statute was *in pari materia* with the statute under which the election was held, limiting the date of the maturity of such bonds at twenty years. (*Post, pp.* 726, 730.)

Acts cited and construed: 1887, ch. 3; 1903, ch. 276, sec. 2.

13. **SAME.** Statute authorizing bonds, not to exceed six per cent. interest, is not a departure from the proposition to accept bonds bearing not less than four per cent. interest.

Where a railroad's proposition to take the city's bonds in payment of its subscription for stock in the railroad, was that the

bonds bear interest at not less than four per cent.—a statute validating the subscription and providing that the interest on the bonds should not exceed six per cent., did not constitute a departure from the terms of the proposition submitted and accepted by the city. (*Post, pp.* 730, 731.)

Act cited and construed: 1903, ch. 276, sec. 2.

14. **SAME.** Statute validating subscription for railroad stock operative as original statute, when.

A statute validating a city's subscription for stock in a railroad operates retrospectively to legalize the subscription to the same extent as though authority had been previously given. (*Post, p.* 731.)

Act cited and construed: 1903, ch. 276.

Cases cited and approved: Shields v. Land Co., 94 Tenn., 123; Muse v. Lexington, 110 Tenn., 655; Supervisors v. Brown, 112 U. S., 261.

15. **CHANCERY PLEADING AND PRACTICE.** Facts constituting fraud, and not mere general averments of fraud, must be alleged.

Wherever fraud is claimed as a basis of relief, it is essential that the facts which constitute it shall be set out clearly, concisely, and with sufficient particularity to apprise the defendant or the adversary party of what he is called upon to answer, and mere general allegations of fraud are not sufficient. (*Post, pp.* 710-712.)

Cases cited and approved: Fort v. Orndoff, 7 Heis., 167; Winham v. Crutcher, 2 Tenn. Chy., 535; Raht v. Mining Co., 5 Lea, 1; Crockett v. McLanahan, 109 Tenn., 517; Marquez v. Frisbrie, 161 U. S., 473.

Furnace Co. v. Railroad.

FROM MONTGOMERY.

Appeal from the Chancery Court of Montgomery County.—J. W. STOUT, Chancellor.

MICHAEL SAVAGE, DANIEL & DANIEL, JOHN J. VERTREES and JAMES C. BRADFORD, for complainants.

JOHN A. PITTS, W. D. WITHERSPOON and GHOLSON, LYLE & PEAY, for Railroad.

LEECH & PONDER and DANCEY FORT, for Clarksville.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The present bill was filed by taxpayers of the city of Clarksville, in Montgomery county of this State, impeaching a subscription of $100,000 made by that city to the capital stock of the Nashville & Clarksville Railroad Company, which afterwards, by an act of the legislature, had its corporate name changed to the Tennessee

Central Railroad Company, and asking that the city of Clarksville be enjoined from issuing its bonds in payment of this subscription. Demurrers were interposed by the two defendants, challenging the legal sufficiency of all the grounds upon which complainants asked relief. Upon the hearing of the cause on demurrer, a decree was pronounced by the chancellor dismissing the bill on the ground that chapter 276, p. 796, of the Session Acts of the Legislature of 1903, had cured all the irregularities complained of therein. Upon appeal this decree was reversed by the court of chancery appeals, and the case is now before us for review.

It appears from the recitals of the original bill and the amendments thereto that the Nashville & Clarksville Railroad Company, a corporation organized and existing under the laws of Tennessee, on the 21st day of June, 1901, addressed a written communication to the mayor of the city of Clarksville, in which it was stated that this company proposed "to construct a standard-gauge steam railroad from a point within the corporate limits, connecting with the tracks of the Tennessee Central Railroad or those of the Nashville Terminal Company, and crossing the Cumberland river . . . in a northwest direction, to a point in the county of Montgomery, Tennessee, at a line between the States of Tennessee and Kentucky," and asking a subscription to its capital stock by the city of Clarksville in the sum of $100,000, upon certain conditions, of which those material to this litigation may be summarized as follows:

First.  That the construction of the line of railroad should be commenced at Nashville within six months, and completed to Clarksville within twenty-four months, from date of subscription.

Second.  That no part of the subscription should become due and payable until the railroad was constructed and put in operation within the period of time stipulated as above, and substantially on the line as shown on the plan or map attached to the communication, and when this was done the subscription should become due and payable.

Third.  Payment for the stock subscription of the city to be made at the option of the city "in cash or in its twenty year coupon bonds, bearing interest at not less than four per cent. per annum, payable semiannually."

A meeting of the board of mayor and aldermen of the city of Clarksville was held on the 5th day of July, 1901, at which this communication was submitted, and thereupon a resolution was adopted declaring it to be sense of the board "that an election should be held by the qualified voters of the city of Clarksville to determine whether or not the city, in its corporate capacity, shall make the subscription asked for by the Nashville & Clarksville Railroad, in the amount and upon the terms and conditions set forth in the application," and fixing the 8th day of August, 1901, as the date of the election, which should "be held according to the laws of the State

113 Tenn—45

regarding elections, by the duly qualified election offi-
cers, who thereafter should make the returns, showing
the votes cast for, and those against subscription."

On the 6th of July, 1901, the commissioners of regis-
tration of Montgomery county gave the statutory notice
that on the 8th day of August, 1901, an election would
be held at two voting places named in the notice between
the hours of 9 a. m. and 4 p. m., at which the qualified
voters of the city of Clarksville should vote in order to
determine whether or not the city of Clarksville should
make a subscription to the capital stock of the Nashville
& Clarksville Railroad Company, upon the terms and
conditions of the application or proposition submitted
by the railroad company to the municipal authorities,
which application or proposition was by the commis-
sioners appended to the election notice.

The election thus ordered was held on the day ap-
pointed, and in due time a return of the same was made
by the commissioners of registration to the board of
mayor and aldermen, of that city, in which they re-
ported at this election held "in accordance with the
law as found in chapter 3, p. 57, of the Acts of the Leg-
islature of 1887, and by resolution of the board, there
was cast a total of 904 votes of the qualified voters of
the city of Clarksville, of which total 681 votes were for,
and 223 were against, the subscription." They further
reported that, in addition to this total 88 votes were
cast which "were rejected and thrown out by the judges
of the election as illegal."

On the 15th of August, 1901, at a meeting of the board of mayor and aldermen of that city, this report of the commissioners was submitted and was approved; and in consideration of the fact that it appeared to the board that the election was fair, and that more than three-fourths of the votes cast were in favor of subscription, it was therefore resolved that the "mayor of Clarksville be, and he is hereby, authorized and directed, in the name and for and on behalf of the municipality, . . . to formally subscribe for one hundred thousand dollars of the capital stock of the Nashville & Clarksville Railroad Company, upon the terms and conditions of the proposition submitted," and hereinbefore set out.

This formal act of subscription was done by the mayor on the 15th day of April, 1902.

The original bill and the amendments thereto charge various irregularities as of an invalidating character in the holding of this election. The principal grounds of assault are:

(1) That the termini of the railroad to be constructed were not sufficiently definite.

. (2) That the line of the contemplated railroad was not located in the application with sufficient certainty.

(3) That the city of Clarksville lacks power to make the subscription.

(4) That the election was ordered by resolution, when it should have been by ordinance.

(5) That, in giving the public notice calling the elec-

tion, the commissioners styled themselves "commissioners of election."

(6) That the election was void because held at only two voting precincts, when there were ten wards in the city.

(7) That there were 88 ballots cast which the officers of the election rejected without giving any reason therefor,

(8)· That the ballots were not in proper form.

(9) That certain persons (naming them, 15 in number) voted in the election, "For Subscription," about one-half of whom were disqualified by reason of their conviction of infamous crimes, and the remainder had been bribed by the railroad company to vote for subscription.

In addition, it is charged that the railroad had not been completed within the period of time fixed in the application or proposition, and that chapter 276, p. 796, of the Acts of 1903, ratifying and approving the subscription, was unconstitutional and void.

An examination of the record satisfies us that the first three of these grounds are without merit, and they are thus disposed of without discussion. This is equally true so far as the fifth ground is concerned, as it is apparent that the use of the word "election" instead of "registration" by the commissioners of registration in their public notice advertising the election was a clerical error, which was not misleading. As to the sixth ground, we do not understand the original bill to affirm that

there were ten voting places in Clarksville—one in each ward—and that the election was held only in two of these wards, and therefore was invalid, but rather that the city was divided into ten wards, and the election was held at two voting precincts; one being the police station, and the other the courthouse. Certainly the pleader did not understand himself so to allege, for in one of the amendments to the bill it is distinctly averred that there were three voting places in the city, and the polls were opened at only two of these. But it is nowhere alleged that any voter was deprived of his right of suffrage by such omission, or that detriment was worked to any one thereby. With regard to this irregularity, and those other irregularities embraced in the fourth, seventh, and eighth grounds set out above, we are satisfied that if chapter 276, p. 796, of the Acts of 1903, is constitutional, they have been condoned by the legislature, and cannot now be the basis of complaint. For it is well settled that under our constitution there may be special legislation as to municipal communities, from which it necessarily follows that the legislature, as to such communities, may ratify and approve what has been irregularly done by them, if it could have authorized in the beginning the thing to have been done at all.

But speaking to the ninth ground, we are not prepared to hold that an election carried by a corrupt use of money, or by the votes of person rendered infamous by judgments of courts of competent jurisdiction, would be any more validated by a subsequent act of the legisla-

ture than such use and such votes could be authorized by prior legislative action. While it is true the theory as to the power of legislature is that it is unlimited, save by the State and federal constitutions, yet we think it would hardly be maintained it could by a valid act sanction or authorize bribery, or the casting of ballots by persons who had not been relieved from judgments of infamy pronounced against them, in an election to be thereafter held in any municipality. The terms of our State constitution, making it the duty of the general assembly to pass laws "to secure freedom of elections, and the purity of the ballot box," repel the implication of such power. It seems to us no argument is required to sustain this proposition. Its inherent soundness is found in its statement.

This being so, it becomes necessary to examine the pleadings in the cause, to ascertain whether complainants, in the face of the demurrer of defendants, have made such averments as will authorize the court to investigate the election in question, so as to determine whether it was carried by the votes of electors corrupted by the use of money, or of persons disqualified by judgments of infamy pronounced against them by courts having jurisdiction. Before doing this, however, it is proper to bear in mind certain rules which control the courts in the investigation of fraud.

It is well settled that a mere general averment of fraud, without setting out the facts upon which the charge is predicated, is not sufficient. Wherever fraud

Furnace Co. v. Railroad.

is claimed as a basis of relief, it is held to be essential that the facts which constitute it shall be set out "clearly, concisely, and with sufficient particularity to apprise the defendant or the adversary party of what he is called upon to answer." *Fort* v. *Orndoff*, 7 Heisk., 167.; *Winham* v. *Crutcher*, 2 Tenn. Ch., 535; *Raht* v. *Mining Co.*, 5 Lea, 1, and cases cited in note 1, p. 687, vol. 9, Ency. Pl. & Pr.

This is especially true where, as in the present case, extraordinary relief by injunction is required. "In such a case," as is said by Chancellor Gibson in his work on Suits in Equity, section 785, "the bill is not only a pleading setting forth a cause of action, but it is also an affidavit showing reasons why the complainant is entitled to relief. . . . If any averments are based on information at all, the source of the information should be stated, and the complainant aver his belief in its credibility. The bill should show definitely on its face what allegations are made on complainant's own knowledge, and what on information and belief. The bill should be sworn to positively, and the affidavit should so show."

The rule requiring specific allegations where fraud is averred as a ground for relief was rigidly applied in *Crockett* v. *McLanahan*, 109 Tenn., 517, 72 S. W., 950, 61 L. R. A., 914, where the legality of an election arose, because, as was argued, a proposition such as we have in this case had not been carried by a constitutional majority of the qualified voters of Nashville. It was

there held that the bill making such an attack must give the names of the disqualified voters, so that an issue might be made as to their disqualification.

Turning now to the pleadings, we find that the original bill charges that 88 ballots were cast which were rejected by the judges of the election; but it is nowhere alleged that these were the ballots of qualified voters, or that the judges violated any legal duty in rejecting them.

We think it evident no relief could be given on such an averment, for, in addition to its vagueness, it must be assumed, in the lack of specific charge, that in this there was no abuse of power on the part of the judges holding the election; that they discharged their duty in rejecting these ballots—in other words, that they were thrown out because illegally cast, or for some other reason going to their integrity as ballots.

In the original bill, in a very general way, it was charged that the railroad company used a large amount of money with purchasable voters, and in that corrupt way secured a "number of votes" for the proposition, and that, had it not been for the use of money in corrupting the electors, the number of votes cast "for subscription" would have been greatly below the number returned by the judges of the election.

We do not understand the counsel of complainants to insist "that the expensive machinery of a court of equity is to be put in operation for the purpose of reviewing this election" on such loose and untraversable

allegations of fraud. *Marquez* v. *Frisbie,* 101 U. S., 473, 25 L. Ed., 800.

In certain amendments made to this bill, complainants undertook to make more specific these averments as to fraud. In these they allege that they are informed, and therefore charge, that "representatives and agents of the railroad company gave money to the following parties in consideration of their votes, to wit [naming seven persons] ; that they paid the poll taxes of some of these parties, and paid them from two to seven dollars each for their votes; and that these parties voted for the proposition." They further allege that they are "informed, and therefore charge, that the following parties, to wit (naming nine persons), had prior to said election been convicted of infamous crimes and rendered infamous, and yet they voted in said election and for the proposition."

Passing the failure of complainants to aver that they believe that which they thus charge on information, and dealing first with the averment in regard to the voters who were disqualified because of their conviction of infamous crimes, it will be observed it is not alleged that these convictions were had in a court or courts of competent jurisdiction, nor are the courts where these parties were tried, if tried at all, or the terms of the court at which such trials were had, anywhere alleged. There is nothing in the bill or the amendments thereto to put the defendants on notice as to these essential particulars, and, lacking them, we think the defendants were

not called upon to answer, and that their demurrer, founded on vagueness in allegation, meets and repels so much of the bill as embraces those persons alleged to have been so disqualified.

It will be observed, further, while it is charged that those persons named as having been bribed cast their ballots "for the proposition" (meaning, no doubt "for the subscription"), it is not averred the judges counted them in favor of subscriptions. The votes of persons rendered infamous by a court of competent jurisdiction, and discharged from the rights of citizenship, and of those persons who had been bribed, were illegal, and should have been rejected altogether. In the absence of a specific allegation or the necessary implication from an averment, it would seem it must be assumed on demurrer that all such votes were rejected, and constitute a part of the 88 thrown out by the officers of election. Again, it is not averred that these votes were counted in making up the total of the 681 votes cast, as the judges reported, by qualified voters in favor of subscription. In order to impeach the return of the judges of the election, upon whom rested the duty of accepting the ballots of qualified voters, and rejecting all others, and of making an honest return of the result of the election, it must be shown not only that there were votes cast by disqualified voters in favor of subscription, but that these votes helped to make up the three-fourths majority reported to and by the commissioners of registration. For, as is said in the argument of the counsel of defend-

ant, it makes no difference how many illegal votes were cast and counted or rejected, so none of these illegal votes form an essential part of the constitutional total cast in favor of subscription. We think, in the absence of a distinct averment to that effect, the demurrer to so much of the bill as brought these matters forward should have been sustained..

It is further insisted by the complainants that the railroad was not completed within the time stipulated in the proposition, and for this reason the city of Clarksville was not bound to issue its bonds in payment of its subscription. The bill shows, as has already been stated, that the election was held on the 8th day of August, 1901, and the city council passed an ordinance making effective the vote cast at this election on the 15th day of August, and at the same time directing the mayor to subscribe for the stock in the name of and for the benefit of the city. But there is no averment that the city or its agent came in legal contact with the railroad company at that or any other date, though it is assumed by the counsel for both parties in argument, and stated as a fact in the act of 1903, hereinbefore referred to, that the subscription was made by the mayor on the 15th of April, 1902. The insistence, however, of complainants, is that by the resolution of the board approving the election return, and authorizing a subscription by the mayor to the capital stock to be made, the act of subscription was consummated on the day this resoluact of 1852) was not suspended by the acts of 1867, and

the two years within which the road was to be completed began then, while that of demurrants is that it was not concluded or binding until the 15th of April, 1902, which was the date of the beginning of this period. If complainants are right, their argument implies that the condition as to the finishing and operation of the road within two years from the date of subscription was not met. If, however, that of demurrants was right, it was complied with.

It would seem that a mere acceptance by the council of the city of Clarksville of the returns of the commissioners of registration, and the passage of an ordinance of resolution directing the mayor, "in the name of and for and on behalf of the municipality," to formally subscribe, was not of itself a subscription which without more would bind the corporation. *Nugent* v. *Supervisors,* 19 Wall., 241, 22 L. Ed., 83; *Moultrie* v. *Bank,* 92 U. S., 631, 23 L. Ed., 631; *Bates* v. *Winters,* 97 U. S., 83, 24 L. Ed., 933. Why might not the council the next day have rescinded this action? If it had done so, could the railroad company have complained? Why might not, as in the case of any other proposition for a contract, the city have withdrawn this offer of acceptance before its communication to the railroad? It was not the case of the railroad offering to sell to the city of Clarksville $100,000 of its capital stock, but simply a proposition made to the authorities of the city for a subscription to that amount upon certain conditions embraced in the proposition, and a request that it be

submitted in a legal way for the consideration and de-
termination of the qualified voters of the city. The
election that was accordingly held was nothing more
than a vote of authority to the corporation to act upon
and accept the proposition, not of itself an acceptance.
Until the city, acting upon this warrant of authority, no-
tified the railroad company in some legal way of its ac-
ceptance, the transaction was open and incomplete. It
saw proper to accept, through its mayor, and by a sub-
scription actually made by him. Until he acted for-
mally, we are satisfied that neither party was bound as
by a contract. At any time before this actual subscrip-
tion, this offer upon the part of the railroad company,
we think, might have been withdrawn by it. And we
see no reason for maintaining that it was not equally in
the power of the city to decline to go further with the
negotiation. It is insisted, however, that *Nelson* v. *Hay-
wood County*, 87 Tenn., 781, 11 S. W., 885, 4 L. R. A.,
648, is an authority for the contrary view. The facts
there were that under the authority of an act of the leg-
islature passed in February, 1870, the county court of
Haywood county ordered an election to be held for the
purpose of ascertaining the sense of the voters of the
county as to the issuance of bonds in aid of the con-
struction of the Brownsville & Ohio Railroad; that this
election was held, and the officers holding the same certi-
fied to the county court that the result was that a maj-
ority of the votes was cast for the issuance of the bonds
of the county. On the 4th of May following, the county

court, after reciting the previous order as to the election, and also the result thereof, ordered that "the chairman of this court be, and he is hereby, authorized, empowered, and ordered, in the name of Haywood county, to subscribe upon the books" for $100,000 of its capital stock, upon certain named conditions. This order further recited that "thereupon came into open court J. D. Smith, president of said Brownsville & Ohio Railroad Company, having been thereunto previously authorized by the board of directors of said company, and accepted in the name of said company the one hundred thousand dollars of county subscription herein ordered and the issuance of said county bonds. . . ."

Upon the day following, to wit, May 5, 1870, the present State constitution went into effect, by section 29, art. 2, of which it is provided "the credit of no county, city or town shall be given or loaned to, or in aid of any person, county, association or corporation, except upon an election to be first held by the qualified voters . . . . and the assent of three-fourths of the votes cast at said election."

The validity of the bonds issued by the county of Haywood in aid of this railroad depended upon the question whether the subscription was made so as to be binding and effective before the constitution became operative. This court held, by a majority opinion, that, on the facts set out hereinbefore, the subscription was converted into a contract on the 4th day of May, 1870. The court said: "The contracting parties evidently under-

stood that the act of subscription was then and there consummated. No actual subscription on the books of the company was necessary."

We have no doubt of the soundness of the conclusion announced in that case. There the minds of the two contracting parties came together on the 4th day of May. The county's proposition to subscribe was accepted by the corporation on that day, through its duly constituted representative, and the manual subscription for the stock was unnecessary, and if made thereafter would simply have been evidentiary. In the present case, however, we have no agent or officer of the railroad company, duly authorized to speak for it, presenting himself in the council chamber, and by speech and manner accepting the city's offer to subscribe for the stock, and thus converting the offer into a subscription binding in law.

It is next said in argument, though not alleged by complainants as a ground for relief, that the act of 1887 under which this election was held contemplated a submission to the vote of the qualified electors of Clarksville, as an indivisible proposition, of the question of subscription and that of the mode and terms of payment of that subscription. If this was essential, as was argued, we think it was practically done in this case, as the notice of commissioners of registration of this election had appended, as a part of it, a copy of the proposition, for the information of the voters, and we think every vote for subscription was an approval of the proposi-

tion in its entirety. We do not think, however, that under the constitution there was any necessity on the part of the city to submit to the vote of the people the question as to the mode or manner of payment of the subscription. As was said in the case of *Johnson City* v. *Railroad*, 100 Tenn., 138, 44 S. W., 670, the payment for the subscription was in no sense the lending of credit of the city, and therefore there was no constitutional duty upon the city authorities to submit this qustion to be voted upon. We are satisfied that there was no occasion for the submission of any other question than the one upon which the citizens of Clarksville voted, which, as has already been said, necessarily involved so much of the proposition as covered the mode of payment.

The next question is upon chapter 276, p. 796, of the Acts of 1903. Is it constitutional? And if so, what is its effect?

This act is entitled "An act to approve a subscription made by the city of Clarksville for one hundred thousand dollars of the capital stock of the Nashville & Clarksville Railroad Company, and to authorize said city to issue its bonds in payment of same, or to provide cash funds for payment."

The preamble to this act contains recitals of the submission by the board of mayor and aldermen of the proposition to subscribe for $100,000 of the capital stock of the railroad company to the qualified voters of the city of Clarksville, and of the holding of the election, and of the resolution of the board affirming the election to

have been fair, with the result that more than three-fourths of the qualified voters of the city had voted in favor of the subscription, and that under the authority of an ordinance passed thereafter by the board, empowering him so to do, the mayor had duly, on the 15th of April, 1902, in the name and on behalf of the city, made the subscription, and that the Nashville & Clarksville Railroad Company had changed its corporate name to that of the Tennessee Central Railroad Company. This preamble is then followed by the enacting sections or clauses, only two of which need be mentioned. The first of them provides "that the . . . . subscription by the city of Clarksville of one hundred thousand dollars of the capital stock of the Nashville & Clarksville Railroad Company . . . . be and the same is hereby ratified and approved; and that the said city . . be and is . . . . . empowered to provide either by resolution or ordinance of its governing body . . . for the issuance of . . . . its negotiable bonds . . . . running the period and bearing the rate of interest prescribed by the terms of said subscription, and deliver the same to said railroad company in payment of said subscription, in the manner and upon the terms . . . . contained in the subscription ordinance."

The second section is as follows: "Be it further enacted, that in the event the said city of Clarksville shall elect to pay said subscription in cash, it may in like man-

ner, by resolution or ordinance of its governing body, approved by the mayor, provide for the issuance of and issue its negotiable bonds in a sum not exceeding one hundred thousand dollars, in such denominations, and running for such period of time, and bearing such rate of interest not exceeding six per cent. per annum, as may be determined by said resolution or ordinance, and sell the same at not less than par for the purpose of providing cash funds for the payment of said subscription, and may use and apply the proceeds . . . as may be necessary in the payment of said subscription when the same shall become due and payable: provided, in no event shall this act be held to authorize the issuance of more than one hundred thousand dollars of bonds, par value, by the said city of Clarksville, and in case the said bonds should be sold by the said city at a premium, any excess of proceeds from the bonds sold, above the amount required to pay said subscription, shall be covered into the treasury of said city as a special fund, and to be applied to the payment of interest accruing after the issuance upon the bonds issued."

In the first place, the complainants, through their able counsel, insist that this act is void because it is a partial law, suspending, for the benefit of the city of Clarksville, the general railroad subscription act of 1887, modified, as is contended, by the general election law known as the "Dortch Law" of 1890.

Since the case of *State* v. *Wilson,* 12 Lea, 246, it has been the settled law of this State that special legislation

as to municipal corporations is not within the inhibition of article 11, section 8, of the constitution of 1870. Since the opinion in that case (its conclusion being re-affirmed in *Ballentine* v. *Pulaski,* 15 Lea, 636), many acts of the legislature dealing with particular municipal corporations have been passed, some of which have been before this court, and the authority of these two cases has been uniformly recognized. See *Williams* v. *Nashville,* 89 Tenn., 487, 15 S. W., 364; *Reelfoot* v. *Dawson,* 97 Tenn., 151, 36 S. W., 1041, 34 L. R. A., 725; *Burnett* v. *Maloney,* 97 Tenn., 697, 37 S. W., 689, 34 L. R.A., 541; *Davis* v. *Rogersville,* 107 Tenn., 588, 64 S. W., 893; Redistricting Cases, 111 Tenn., 234, 80 S. W., 750.

Coming now to the question raised by the complainants, that the ratifying or curative act of 1903 is a partial law suspending general laws for the benefit of the city of Clarksville, we think the case of *Lauderdale County* v. *Fargasson,* 7 Lea, 153, a controlling authority against this contention. That case arose under the constitution of 1834, and involved the legality of bonds issued in accordance with two acts of the legislature, the first of which was passed February 25, and the last Nov. 5, 1867.

By these acts, any county along the line which the Mississippi Railroad was proposing to build was authorized to subscribe for its capital stock to any amount not exceeding two-thirds of the estimated cost of grading the roadbed through the county, and to issue short-time bonds to the railroad company in anticipation of the revenues to be raised from taxes which the county

was empowered to levy to meet these bonds; and this was
to be done by the majority of the justices of the county,
assembled either in general or special session, without
referring the matter to the qualified voters of the county.
At the time of the passage of these acts the general rail-
road subscription act of 1852 was in force, by the terms
of which all counties and incorporated towns and cities
of the State were authorized to make such subscriptions
in the prescribed way and upon prescribed conditions,
a majority of the qualified voters assenting thereto, but
not otherwise.

The line of this projected road was laid out to pass
through Lauderdale county and a majority of the jus-
tices of the county, in court assembled under the autho-
rity of the acts of 1887, made a subscription for an
amount of the capital stock of that road, and issued
short-time bonds to the railroad company in payment
of that stock; and the case in question involved the val-
idity of this action.

It was insisted by the complainant, Fargason, that
the act of 1852 was "the general law of the land at the
time of the passage of the act under which these bonds
are [were] issued, and that these acts were void, and
that either they suspended a general law for the bene-
fit of the particular counties, or else conferred a benefit
on these counties inconsistent with the general law of
the land." The court said, however, that this insistence
was in no sense sound, that the general law (that is, the
ast of 1852) was not suspended by the acts of 1867, and

that the prohibition of the constitutional provision referred to had no rightful application to the contracting of obligation by which burdens are self-imposed by counties and incorporated towns. It is true, this case arose under the constitution of 1834, but the section of that constitution invoked to invalidate the bonds in question is repeated *in totidem verbis* in our present constitution. So this court referred to it as authority in *Burnett* v. *Maloney,* supra. While in this latter case there was a dissenting opinion, yet it did not reach the point we are now considering; and, so far as the record shows there was a concurrence of view by all the judges on this point. We do not see any reason now to doubt the soundness of the conclusion announced in the Fargason case; nor can we see any peril likely to result from adapting legislation to meet the special needs of particular counties, cities, or incorporated towns. It is true, many evils have resulted from the self-imposition by municipal corporations of burdens in the way of bonuses or subscriptions to the capital stock of railroads, yet we think, if these burdens are to be avoided, some other ground for doing so must be found than the one insisted upon by the complainants.

It is next contended that this ratifying or curative act is violative of section 17 of article 2 of our constitution, which provides as follows: "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

Assuming for the moment that the legislature may,

within proper constitutional limitations, pass a ratify-
ing or curative act, does the present act have the vice
thus attributed to it?   Its avowed purpose was to ap-
prove the subscription already made by the city of
Clarksville to the capital stock of the Nashville &
Clarksville Railroad Company, and to authorize the city
to provide funds for the payment of the same. The body
of the act corresponds with the title, and the question is,
does the act contain more than one subject?

    This act was drafted in view of the contract already
made by the city with the railroad company.   By the
terms of the contract, payment for the stock which the
city agreed to take might be made either in cash or
twenty-year bonds of the city, bearing interest at not
less than 4 per cent., payable semiannually, as the city
might elect.   This contract was strictly within the lim-
itations of section 12 of chapter 3, p. 60, of the Acts of
1887.   We think it clear that the act and proposition
both contemplated that after the subscription was made
the option was to be open for the city of Clarksville to
determine the mode of payment for this either in its
20-years bonds or in cash; the limitation on this
option being that if paid in bonds they should bear not
less than 4 per cent. interest.   Thus the matter stood at
the passage of the act of 1903, and it would seem that
any resolution which came to the aid of the city in dis-
charging its contract in either mode would be in har-
mony with the contract, and would derogate neither
from the rights of the railroad nor the city.

Furnace Co. v. Railroad.

And further it would seem that any provision by the act itself of the method by which the city could discharge its liability or its subscription would be cognate to the purpose of the act.  It is as if the legislature had said to the city of Clarksville:  "I authorize you to make this subscription, or, having made it, I now ratify it, and empower you to use one of two methods to discharge your liability—either to issue your bonds direct to the railroad, bearing not more than six per cent. interest, in payment thereof, or else to put the bonds on the market for the purpose of realizing cash and appropriating enough of the funds so received to pay the subscription; the excess, if any, to be covered into your treasury." The authority to incur the obligation involved the idea of payment.  The two were connected, so that, in authorizing the one, naturally the other was to be provided for.  And so it was, when the legislature came to its act of ratification of the contract already made, it provided, of logical necessity, the method by which the contract was to be discharged; and in so doing it was acting, as we think, strictly within constitutional limitations.

In *Ryan* v. *Terminal Company*, 102 Tenn., 111, 50 S. W., 744, 45 L. R. A., 303, this clause of the constitution was invoked to invalidate an act entitled "An act to amend an act entitled 'An act to provide for the organization of railroad terminal corporations and define the powers, duties and liabilities thereof,' " because, as was insisted, this title covered much of incongruous legislation.  Among the provisions found in the act which were

supposed to be subject to this criticism were those which empowered railroad companies entering into contracts with the terminal company to guaranty the principal and interest of bonds issued by such company, as well as other contracts made by it in regard to its corporate business, and also to subscribe for holding and disposing of the capital stock or bonds which might be issued by the terminal corporation.

It was there argued with much force and plausibility that these provisions were foreign to the title, and introduced into the body of the act new and independent subjects. After a review of the authorities, the court rejected this contention, and, adopting the language of Judge Cooley, said, "The generality of a title is no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as bearing necessary or proper connection."

Again returning to the line of suggestion already made, had this been an act authorizing the city of Clarksville to subscribe for $100,000 capital stock of this railroad in the event three-fourths of the qualified voters of the city, at an election held, approved the subscription, and to issue its bonds to pay for the same, and both these matters were embraced in the title and the body of the act, could it be maintained that these were distinct and independent subjects, making the whole act void? That the authority to subscribe was one thing, and providing a mode of payment was a dif-

ferent thing?    If these questions must be affirmatively
answered, then chapter 3, page 57, of the Acts of 1887,
providing a general law for subscription to the stock of
railroads, which complainant seeks to interpose as an
obstacle to this special act, is also void.    For on exam-
ination it is found to contain the same vice charged
against this special legislation.    That act is entitled "An
act to empower counties and incorporated cities, and
towns to subscribe to the capital stock of any railroad
company,  .  .  .  and to provide for the payment of
such subscriptions."    Section 12 of this act follows the
title, and does what section 2 of chapter 276, page 797,
of the Acts of 1903, attempts to do; that is, it provided
a method of discharging a subscription made under the
terms of this general act.    This statute has been stand-
ing unchallenged for about seventeen years, and under
it, no doubt, subscriptions have been made, and many
bonds issued; and while this would not prevent the
court from declaring it, if necessary to do so, unconsti-
stitutional, yet it would greatly increase our responsi-
bility, and require of us the closest scrutiny before
reaching such result.

But the argument of the counsel of complainant in
relying upon this act as one which, in part, serves to
avoid the curative act of 1903, by clear implication, con-
cedes the constitutionality of that act; and we think
that, if in it there was no violation of the constitutional
provision in question, there is none in the act now being
examined.    We do not think, however, either of these

acts obnoxious to the clause of the constitution invoked by the complainants.

It is further insisted that chapter 276 is void because it confers a new power upon the city, in that it authorizes the issuance of bonds for a longer term than twenty years, by mere resolution of the municipal board, when one of the terms of the proposition voted on was that payment should be made in 20-year bonds, bearing not more than 4 per cent. interest. It is true that section 2 of the act does not fix the date of the maturity of the bonds which are to be issued under its authority, but chapter 3, page 57, of the Acts of 1887, does; and these two acts, being *in pari materia* on this point, are to be construed together, so as to impose a 20-years' limitation in the running of these bonds, and thus leave the proposition and section 2 of chapter 276, page 796, corresponding in every particular.

Nor does section 2 of chapter 276 make a departure so far as interest is concerned. The proposition submitted was to take bonds in payment of the subscription, bearing interest at not less than 4 per cent. Not more than 6 per cent. could be paid on these bonds under the law. The proposition therefore left it open for adjustment, as between the city and the railroad, as to the rate of interest—anywhere between 4 per cent. and 6 per cent. So, when the legislature authorized the issuance of these bonds, and limited interest upon them to 6 per cent., we do not discover in what respect it made

a departure from the terms of the proposition submitted to and accepted by the city.

This leaves open, as the only question yet to be determined, the right of the legislature to pass chapter 276 of the Acts of 1903, and its legal effect. This question has already been answered in our reported cases. *Shields* v. *Land Company*, 94 Tenn., 123, 28 S. W., 668, 26 L. R. A., 509, 45 Am. St. Rep., 700; *Muse* v. *Lexington*, 110 Tenn., 655, 76 S. W., 481. The import of these cases may be condensed in a paragraph from *Sykes* v. *Mayor*, 55 Miss., 137, embodied and approved in the opinion of the court in *Grenada Supervisors* v. *Brown*, 112 U. S., 261, 5 Sup. Ct., 125, 28 L. Ed., 704: "The idea implied in the ratification of a municipal act performed without previous legislative authority is that the ratifying communicates authority which relates back to and retrospectively vivifies and legalizes the act, as if the power had been previously given."

It results that the demurrer to the bill on the point discussed herein was well taken, and the decree of the court of chancery appeals must be reversed and the bill of complainants dismissed.