W. H. POTTER *v.* M. J. ROBBINS.*

(*Nashville.* December Term, 1926.)

Opinion filed, December 13, 1926.

1. ELECTION. Contest. Illegal votes. Rule of apportionment.

It seems obvious that the rule of apportionment of illegal voters between the candidates in proportion to their total votes in the precinct is a rule of expediency, for the application of which there can be no reason when evidence is available to prove for whom the illegal votes were actually cast. Proof of the ballot cast by the disqualified voter produces a certain result, while the rule of apportionment can at best produce only an approximate result. (*Post*, p. 7-9.)

Citing and distinguishing: Moore v. Sharp, 98 Tenn., 491, 501.

2. SAME. Same.

A rule of apportionment of illegal voters is inapplicable in the absence of any averment that the petitioner was informed and be-

(1)

lieved that the illegal votes specified, or a sufficient number of them to change the result, were cast for the defendant, or an averment, after the exercise of diligence, petitioner had been unable to discover and was therefore unable to aver for whom the illegal votes were cast. (Post, p. 5-7.)

Citing: Furance Co. v. Railroad, 113 Tenn., 697, 714; Heyfron v. Mahoney, 9 Mont., 497, 18 Am. St. Rep. 761; McCrary on Election (3 Ed.), sec. 460 (4th Ed., secs. 495, 497); Paine on Election, sec. 513; Berg v. Veit, 136 Minn., 443, 162 N. W., 522.

3. **ELECTION CONTESTS. County judge. Qualification.**

That the defendant is not a licensed lawyer and therefore not qualified to hold the office of county judge is controlled by the opinion announced in J. H. Heard v. John Moore, p. 154 Tenn. 566. (Post, p. 10.)

---

*Headnotes 1. Elections, 20 C. J., Section 292; 2. Elections, 20 C. J., Section 317 (Anno); 3. Elections, 20 C. J., Section 317 (Anno); 4. Elections, 20 C. J., Sections 317 (Anno), 353; 5. Elections, 20 C. J., Section 317 (Anno); 6. Elections, 20 C. J., Sections 333, 341; 7. Elections, 20 C. J., Section 317 (Anno); 8. Elections, 20 C. J., Section 280; 9. Judges, 33 C. J., Section 27.

---

FROM SCOTT.

---

Appeal from the Chancery Court of Scott County.— Hon. J. H. Wallace, Chancellor.

Howard H. Baker and Horace M. Carr, for plaintiff.

H. K. Pemberton, Fowler & Fowler, E. G. Foster and Smith and Carlock, for defendant.

MR. JUSTICE SWIGGART delivered the opinion of the Court.

The appellant, W. H. Potter, duly filed his petition before the Chancellor of the second division, to contest the election of the defendant, M. J. Robbins, to the office of County Judge for Scott County, at the August election, 1926.

The petition averred that Potter received the majority of the legal votes cast at said election, and was entitled to the office, notwithstanding Robbins was given a majority on the face of the returns.

The petition contained a prayer for a decree that Potter was entitled to the office, and also an alternative prayer that the election be declared void because Robbins was not a licensed lawyer, and, therefore, is ineligible to hold the office.

The appeal is from the action of the Chancellor in sustaining a demurrer to the petition.

Averments of the petition that more than 100 voters were given unlawful aid in marking their ballots, and that by the illegal use of money the defendant procured sufficient illegal votes to bring about his election, were held to be too general, and one of the grounds of demurrer directed at these averments was sustained by the Chancellor.

The appellant concedes on his brief that the demurrer was good as to these averments, and they need not be noticed in this opinion.

The petition avers that there were three candidates for the office of county judge; that petitioner received on the face of the returns 1001 votes; that the defendant received 1065 votes, and that the third candidate received 936 votes. It will be noted that the defendant's plurality

over the third candidate is only 129 votes, and that the petitioner's plurality over the third candidate is only 65 votes.

The petition contains averments expressly admitting and alleging that the irregularities pointed out did not render the election void, and that a valid election was held.

Petitioner averred "that of the legal votes cast in said election he received a clear majority and is entitled to said office."

Then follow averments that in four precincts of the second civil district of the county the defendant was given 450 votes and petitioner only 68 votes; that in these four precincts 199 persons voted who were required by law to pay poll taxes as a condition precedent to their right to vote, and who had, in fact, not paid their poll taxes as much as sixty days prior to the date of the election, as required by law. Two other election precincts are then named, in one of which it is averred that the defendant was given 54 votes and the petitioner 19 votes, with 32 illegal votes cast, and in the other of these two precincts it is averred that the defendant was given 41 votes and the petitioner 6 votes, with 15 illegal votes cast. The names of the voters alleged to have been disqualified because of their failure to pay poll taxes are given in each of said six precincts.

Following the enumeration of the illegal votes in each of said precincts the petition contains the following:

"Petitioner charges that by eliminating these illegal voters he has a clear majority of all the votes cast in said election, and that he was legally and constitutionally elected County Judge of Scott County, and is entitled to said office."

The quotation last made from the petition is explanatory of the averment made at the outset of the petition,

that the petitioner received a majority of the legal votes cast in the election. Petitioner's claim is, on the face of the bill, that the polls should be purged of the illegal votes, and that he be declared elected because receiving a majority of the ballots after eliminating the illegal votes.

On the brief filed for the petitioner it is urged that the purging of the polls should be accomplished by apportioning the illegal votes between the candidates, according to the entire vote returned for each candidate, each precinct or ballot box to be treated separately in this procedure. *Moore* v. *Sharp,* 98 Tenn., 491, is relied upon as supporting petitioner's contention that this may be done.

It will be noted that the petition discloses a third candidate who received almost as many votes as either the petitioner or the defendant. The bill does not disclose how many votes this third candidate received in each of the six precincts named in the petition.

Neither does the petition disclose how many votes the petitioner and the defendant, respectively, received in each of the four precincts in the second civil district. These four precincts are grouped, with the statement in the bill that in the four precincts the defendant was given a vote of 450, and the petitioner a vote of 68.

Even if it could be conceded that the votes described as illegal could be apportioned according to the rules stated in *Moore* v. *Sharp, supra,* we think the averments of the petition fall short of showing a state of fact which would entitle the petitioner to be declared elected.

The failure to specify the vote of the petitioner and the defendant in each of the four precincts of the second civil district renders it impossible to determine how the illegal votes in each of said precincts would be apportioned between the two candidates under the rule invoked, and

the bill fails to disclose the effect on the election result of applying the rule to the vote cast in these precincts.

Certainly it cannot be urged successfully that illegal votes cast in a given precinct should be apportioned between the two leading candidates, to the exclusion of the third candidate. The bill discloses that there was a third candidate whose total vote was within 129 votes of the total received by the defendant, and failing to disclose the vote received by such candidate in the precincts in which the illegal votes were cast, it is impossible to ascertain from the averments of the bill how the illegal votes would be apportioned between the three candidates, under the rule invoked by petitioner, nor whether the purging of the polls of these illegal votes would disclose the election of the defendant, the petitioner, or the third candidate.

The substance of the petition is that the defendant received a plurality of 64 votes on the face of the returns; that in six election precincts a total of 246 illegal votes were cast; that in these six precincts the petitioner received only 93 votes, while the defendant received a total of 545 votes. The vote received by the third candidate in the six precincts is not disclosed.

The bill does not aver, even on information and belief, that any of said illegal votes were cast for and counted for the defendant.

In *Furnace Co.* v. *Railroad,* 113 Tenn., 697, 714, a suit to invalidate an election for a bond issue, this court said:

"In order to impeach the return of the judges of the election, upon whom rested the duty of accepting the ballots of qualified voters, and rejecting all others, and of making an honest return of the result of the election, it must be shown not only that there were votes cast by disqualified voters in favor of subscription, but that these

votes helped to make up the three-fourths majority reported to and by the commissioners of registration. For, as is said in the argument of the counsel of defendant, it makes no difference how many illegal votes were cast and counted or rejected, so none of these illegal votes form an essential part of the constitutional total cast in favor of subscription. We think, in the absence of a distinct averment to that effect, the demurrer to so much of the bill as brought these matters forward should have been sustained.''

Petitioner contends that this principle should not be applied to a petition filed to contest an election held under the Dortch ballot law, for the reason that, as held in *Moore* v. *Sharp, supra,* neither legal or illegal voters may be compelled to disclose their ballots in such an election, and a contestant may, therefore, be without power to disclose for whom the illegal votes were cast.

To this it may be replied, however, that the ballot cast in an election may be proved by direct or circumstantial evidence other than the voter's own statement. *Moore* v. *Sharp,* 98 Tenn., 491, 501.

The rule that illegal votes cast in a given election precinct may be apportioned between the candidates according to the total vote received by each candidate in the particular precinct, when it does not appear from the evidence for whom the illegal votes were actually cast, was applied in *Moore* v. *Sharp* because the circuit judge stated in the record that counsel on both sides agreed that it should be applied. Furthermore, the opinion of this court in that case states that "On the trial below it was developed that illegal votes were polled, but it was impossible to ascertain for whom they were cast.'' It appears, therefore, that counsel agreed to the application of the rule of apportionment only after it was developed

that it was impossible to ascertain for whom the illegal votes were cast.

The rule was taken from the opinion of the Supreme Court of Montana in the case of *Heyfron* v. *Mahoney*, 9 Mont., 497, 18 Am. St. Rep., 761. In that case the Supreme Court of Montana quoted the rule from McCrary on Elections (3 Ed.), sec. 460 (4th Ed., secs. 495-497), where the author qualifies the rule as follows: "Let it be understood that we are here referring to a case where it is found to be impossible, by the use of due diligence, to show for whom the illegal votes were cast." .

Even with this qualification the rule of apportionment is disapproved in Paine on Elections, sec. 513, where it is said: "Where illegal votes have been cast, the true rule is to purge the poll by first proving for whom they were cast, and thus ascertain the real vote; but if this cannot be done, then to exclude the poll altogether. This is safer than the rule which arbitrarily apportions the fraud among the parties."

In *Berg* v. *Veit*, 136 Minn., 443, 162 N. W., 522, the Supreme Court of Minnesota declined to apply the rule of apportionment in the absence of evidence that the contestant was not able to prove for whom the illegal votes were cast, holding that the rule is justifiable "only when it appears that the true fact cannot be ascertained." The court said: "The burden rests upon a contestant to show affirmatively that the one declared elected by the canvassing board did not receive a majority of the legal votes. Where a contestant bases his contest upon the fact that illegal votes were cast, it is incumbent upon him to show that enough of such votes were cast for the contestee to change the result. He is not in position to ask the court to adopt the *pro rata* rule above mentioned, unless he is unable to show for whom the ille-

gal votes were cast, and has established that fact to the satisfaction of the court.''

Responding to the suggestion of the contestant that the illegal voters could refuse to testify, on the ground that such testimony would tend to incriminate them, the Supreme Court of Minnesota, in the case cited, said:

''But this is a privilege personal to the witness and is waived unless claimed by him. Contestant could not invoke this privilege nor assume that the witnesses would invoke it even if they were in position to do so. . . . Moreover, contestant was not limited to the testimony of the voter himself, but could have presented the best available evidence which tended to show for whom the voter probably voted.'' (136 Minn., 447.)

It seems obvious that the rule of apportionment of the illegal voters between the candidates in proportion to their total votes in the precinct, is a rule of expediency, for the application of which there can be no reason when evidence is available to prove for whom the illegal votes were actually cast. Proof of the ballot cast by the disqualified voter produces a certain result, while the rule of apportionment can, at best, produce only an approximate result.

In testing the sufficiency of the petition in the present cause, as showing *prima facie* a state of facts, which, if true, would entitle the petitioner to the office for which he was a candidate, we are unable to apply the rule of apportionment of the illegal voters, in the absence of any averment that the petitioner was informed and believed that the illegal votes specified, or a sufficient number of them to change the result, were cast for the defendant, or an averment that, after the exercise of diligence, petitioner had been unable to discover, and was, therefore, unable to aver for whom the illegal votes were cast.

We are of the opinion, therefore, that the petition fails to state a sufficient ground for contesting the election of the defendant, and that the Chancellor did not err in sustaining the demurrer and dismissing the bill.

Disposition of the alternative averment and prayer of the petition, that the defendant is not a licensed lawyer, and, therefore, is not qualified to hold the office of county judge, is controlled by the opinion announced for the court today by Justice McKINNEY in *J. H. Heard* v. *John Moore,* from Hamilton county. (154 Tenn. 566.)