BUCKHOUSE ET AL., APPELLANTS, *v.* JOINT SCHOOL DIS-
TRICT No. 28 OF LAKE AND MISSOULA COUNTIES
ET AL., RESPONDENTS.

(No. 6,500.)

(Submitted May 20, 1929. Decided June 5, 1929.)

[277 Pac. 961.]

*Mr. E. E. Hershey,* for Appellants, submitted a brief and argued the cause orally.

*Mr. Grover C. Johnson, Mr. Dwight N. Mason, Mr. Donovan Worden* and *Mr. Walter L. Pope,* for Respondents, submitted a brief; *Mr. Pope* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

At the primary election held on July 17, 1928, by a majority of those voting on the question, under the authority of section 1219, Revised Codes 1921, as amended by Chapter 120, Laws of 1925, the tax levy for the defendant joint school district, a district of the second class, was increased by twelve mills in excess of the ten-mill levy allowed by law. In October, 1928, the plaintiffs, as taxpaying freeholders of the district, brought this action to enjoin the collection of the tax. Issue was joined by an answer and reply. The trial resulted in judgment in favor of the defendants. This appeal is from the judgment.

The first question presented for determination arises out of the following facts: The board of trustees of the school district met on July 7, 1928, to canvass the returns of an election held on June 30, 1928, for the same purpose as the one in question here. Upon ascertaining that only sixty-seven voted in favor of the levy and ninety-eight against it at that election, the board called another election to be held on July 17.

1. It is the contention of plaintiffs that, since section 1220 requires that notice of such an election shall be given by posting a notice at each schoolhouse in the district "at least ten days before such election" or by publication for a like period, an election called on the seventh day of July could not be held on the 17th of the same month, because the 7th is only nine days before the 17th, under the rule announced in *State ex rel. Bevan* v. *Mountjoy,* 82 Mont. 594, 268 Pac. 558. Defendants concede the force of that decision, but seek to avoid its effect here by contending that the failure to comply strictly with the statute relative to giving the required notice is immaterial,

where the electors have had actual notice of, and participated generally in, the election and rely upon the following cases in support of their contention: *Wright* v. *Flynn*, 55 Mont. 61, 173 Pac. 421; *State ex rel. Patterson* v. *Lentz*, 50 Mont. 322, 146 Pac. 932; *Leary* v. *Young*, 55 Mont. 275, 176 Pac. 36; *State ex rel. Nelson* v. *Timmons*, 57 Mont. 602, 189 Pac. 871.

The record discloses, and the court found, that notices of such election were posted at each schoolhouse in the district on the seventh day of July, 1928; that pursuant to directions by the trustees, the clerk of the district, on or about July 13, 1928, mailed approximately 500 circular letters to residents of the school district, which stated the time and place of holding the election, and that the mailing list of those to whom the letter was sent was made up from a list of taxpaying freeholders of the district, furnished to the clerk by the county clerk of Lake county in the year 1925, and contained the names of persons whom the clerk "found or believed" to be residents of the district; that in the "Ronan Pioneer," the only newspaper published within the district, appeared a news item in the issue of July 12, 1928, displaying notice of the election; that the newspaper had a circulation of about 650 subscribers, nearly all of whom resided in the district; that notice was also given by the circulation of approximately 700 handbills distributed by the Ronan Post of the American Legion throughout the district; that at the polling places where the primary election for the nomination of the state and county candidates was held on July 17 the attention of the voters was called to the fact that the school election was being held on the same date; that between the 7th and 17th of July, 1928, the fact that the election would be held on the 17th was discussed generally by the people residing within the district; that a larger number of votes was cast on this issue at this election than at any previous election shown to have been held in the same district in 1924, 1925, 1926, 1927, and in the month of June, 1928, on the same issue.

These facts bring the case within the principle recognized and followed in the above-cited cases to the effect that failure to give the statutory notice is immaterial where actual notice

was given and the electors participated generally in the election, particularly where, as here, no proof was offered by plaintiffs showing that any elector was deprived of the right to vote by reason of insufficient notice.

2. It is next contended by plaintiffs that the school district ▮ was not organized to hold an election, for the reason that the board of trustees had not complied with section 991, Revised Codes 1921, requiring it to establish polling places and to create and define the boundaries of election precincts. The complaint does not seek to invalidate the election on this ground, and there was no evidence introduced showing a failure to observe these statutory duties. In the absence of proof on this point the presumption obtains that "official duty has been regularly performed." (Subd. 15, sec. 10606, Rev. Codes 1921.)

3. Plaintiffs contend that the electors in Missoula county ▮ had no place to vote, and for that reason the election was not valid. The record discloses that about fifteen qualified electors of the district reside in Missoula county. The evidence shows, and the court found, that the electors residing in Missoula county voted at Arlee in Lake county. Hence, in view of the decision in the case of *Atkinson* v. *Roosevelt County*, 71 Mont. 165, 277 Pac. 811, the validity of the election is not affected on this account.

4. The validity of the election is assailed because of the failure of the trustees to appoint three qualified judges in the district to act as judges of election as required by section 989, Revised Codes of 1921. The record discloses that the clerk of the school district, acting under instructions of the board, notified thirty-three persons to act as judges, twenty-two of whom were not taxpaying freeholders on the last assessment-roll of the district, and eighteen of whom did not vote for this reason. There is no specific statutory requirement that the judges of an election such as this must be taxpaying freeholders on the last assessment-roll of the district.

Section 1222, in treating of an election for the purpose for which the one here involved was held, provides: "The election

shall be held and the votes canvassed and returned as in other school elections." The requirement of judges at other school elections is that they must be "qualified electors of said district." (Sec. 989, supra.) Qualified electors are those meeting the requirements of section 1002, Revised Codes 1921, which provides: "Every citizen of the United States who has resided in the state of Montana for one year, and thirty days in the school district next preceding the election, may vote thereat. Women of the age of twenty-one years and upwards, who are citizens of the United States, and who have resided in the state of Montana one year, and in the school district for thirty days next preceding the day of the election, may vote thereat." Under section 1219, as amended, an election such as this may be held "at the regular annual election held in said district." If the judges of an election for an additional tax levy must possess qualifications different from those for the judges of the regular annual election, the legislature would have made express provision therefor; not having done so, we hold that the judges of an election to increase the tax levy of a school district need not be taxpaying freeholders on the last assessment-roll of the district.

But lack of qualifications of the judges of election does not affect the validity of the election. In *Wells* v. *Taylor*, 5 Mont. 202, 208, 3 Pac. 258, the court said: "The question is, was there a fair vote and an honest count? If there was, the election is valid though the officers conducting the same were not duly sworn or chosen, or did not possess the qualification requisite for the office."

5. The next attack upon the validity of the election is grounded upon the fact, as disclosed by the record and as found by the court, that 192 persons voted at the election whose names did not appear on the assessment-roll for the year 1927 and who did not pay taxes on real estate for that year. Defendants contend that the qualifications of the voters for the election here involved must be ascertained from the assessment-roll for the year 1928, and that the record does not

disclose whether the names of the alleged illegal voters appeared on that assessment-roll.

In the view we take of the case it is unnecessary to determine whether the 1927 or the 1928 assessment-roll was the proper guide in determining the qualifications of the voters. The record is silent as to how these alleged illegal voters voted. Neither was there any proof offered to show that it was impossible by the use of due diligence to show how the illegal votes were cast.

When sufficient illegal votes have been cast to affect the result of an election, the courts in treating of the situation have generally adopted one of the following four alternatives: (1) Reject the entire poll; (2) apportion the illegal votes; (3) deduct the illegal votes from the candidate having the highest vote; or (4) disregard the illegality.

In Paine on Elections, section 513, it is said: ''Where illegal votes have been cast the true rule is to purge the poll, by first proving for whom they were cast, and thus ascertain the real vote; but, if this cannot be done, then to exclude the poll altogether. This is safer than the rule which arbitrarily apportions the fraud among the parties.'' The rule of apportionment of the illegal votes, applied by some courts, and that of excluding the entire poll, as applied by others, rests upon a showing made that there is no evidence available to prove how the illegal votes were cast. (*Potter* v. *Robbins,* 155 Tenn. 1, 290 S. W. 396.) Thus, McCrary on Elections, fourth edition, sections 495–497, after referring to the rule of apportioning illegal votes and of declaring the election void because of illegal votes, says: ''Let it be understood that we are here referring to a case where it is found to be impossible by the use of due diligence to show for whom the illegal votes were cast.''

Where the inability to show how illegal votes were cast was proven, it has been held that the entire poll may be rejected. (*In re Bright's Contested Election,* 292 Pa. 389, 141 Atl. 254; *King* v. *State,* 96 Okl. 297, 222 Pac. 960.)

As before stated, there is no evidence in this case showing how the illegal votes were cast and no evidence showing that it

was impossible to make this proof. The rule applicable here was applied by this court in the case of *Atkinson* v. *Roosevelt County,* supra, where it is said: "The burden not only rested upon the plaintiff to prove illegal votes cast, but to show how they were cast, for if the latter showing is not made by the evidence, how is a court to know what deductions to make from the votes cast? * * * It was incumbent on the plaintiff to show by a preponderance of the evidence the number of illegal votes received by Wolf Point in each precinct in which illegal voting was charged, and that number must be sufficient, if rejected, to change the result. Where the ballots cast by illegal voters are capable of identification or where satisfactory proof is given as to how the votes were cast, proper deductions should be made by the court so as to determine the correct result. But where votes are shown to have been cast illegally in a given precinct, neither the entire election nor that of a precinct should be annulled, if it may be by the court avoided under the facts. Each case, however, must be determined upon its own peculiar facts. The election must be sustained unless votes cast for a candidate are found to be illegal in number sufficient to change the final result." To the same effect is *Gervais* v. *Rolfe,* 57 Mont. 209, 187 Pac. 899.

6. Likewise, plaintiffs contend that the election is invalid because ninety unit holders of real estate under the Flathead Indian irrigation project voted, though they were not freeholders. Assuming that they were not qualified to vote, the record regarding them is in the same situation as it is with respect to the 192 alleged illegal voters above referred to, and hence, for the reasons there stated, the proof is insufficient to nullify the election on this account.

The other assignments of error are also without merit.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD concur.