## BANK OF ERIN v. HOUSTON COUNTY.

### and

## HOUSTON COUNTY v. BANK OF ERIN, Consolidated Causes.

Middle Section. January 28, 1928.

No petition for Certiorari was filed.

1. **Counties. The records of courts and legislative bodies are the sole witnesses of their proceedings and they can only be proven by duly certified copies of such records.**

    In an action to recover on certain county warrants where it was sought to prove by parol that the loan was authorized by the county court, held that the actions of the county court could be proven only by its records and the actions could not be proven by parol, although the evidence was not objected to.

2. **Counties. A county cannot borrow money unless the power is expressly granted by statute.**

    It is well settled that counties being creatures of statute, have no powers, except those created by statute, and the power to borrow money will not be implied, but must be expressly granted to authorize its exercise.

3. **Counties. A county in Tennessee cannot issue warrants for borrowed money.**

    There is no general statute authorizing counties to issue warrants for borrowed money, and we find no special statute authorizing Houston county to do so.

4. **Counties. Money can be recovered from a county on the theory of implied liability only when it was authorized to create the debt.**

    In an action to recover on certain county warrants where the evidence showed that there was no authority in the county to issue the warrants regardless of the fact that they were not properly issued as to form, held that there could be no recovery on the rule of implied liability because it is based upon an original authority to create the debt, and cannot be invoked where the contract was ultra vires.

5. **Counties. Warrants and bonds issued by a county without legislative authority are void ab initio.**

    We have a long line of cases in our Tennessee Reports holding that warrants and bond issued by counties, cities or towns without legislative authority, are void ab initio and non-enforceable in whosoever hands they may come.

6. **Counties. One dealing with a county must at his peril determine whether or not the county is acting beyond its power.**

    One buying warrants of a county is bound to know whether or not the county had authority to issue the warrants and if it did not he cannot recover although the money was paid out in good faith and received by the county.

7. **School warrants and road orders of a county may be assigned by parol.**
Although an assignment in writing is necessary to pass legal title to school warrants and road orders, yet an equitable title may be passed by parol assignment and delivery and the assignee may recover thereon.

8. **Counties. A county warrant is not a negotiable instrument.**
A county warrant is not a negotiable instrument, but it is a written order by the proper officer upon the treasurer or trustee of the county to pay a specified sum of money to the person named thereon, or to the bearer.

9. **Counties. County warrants legal on their face are prima facie evidence of the validity of the claim.**
It is well established that when county warrants are regular on their face, they establish prima facie the validity of the claims allowed, and authorize their payment; but they have no other effect. An assignee of such warrants takes subject to the risk that they are lawful and properly issued.

10. **Counties. County road orders made with pencil are void.**
Section 1680a1 and Shannon's Code requires all county road orders to be printed or written in pen and ink and such orders written in pencil are void.

11. **Counties. Where county warrant is paid by trustee the instrument is discharged and cannot be revived.**
Where a county trustee paid certain county warrants with his own check and then turned them over to the plaintiff bank, for money with which to pay the warrants, held that the warrants were extinguished by the payment by the trustee and could not be revived by his delivering them to the bank, and the bank could not recover from the county on them, although the bank actually furnished money with which they were paid.

Appeal from Chancery Court, Houston County; Hon. J .W. Stout, Chancellor.

Affirmed.

J. M. Spencer, of Erin, and John S. Daniel, of Clarksville, for appellant.

W. W. Patterson, of Erin, and H. N. Leech, of Clarksville, for appellee.

DeWITT, J. The Bank of Erin has appealed from the decree of the Chancellor denying to it any relief in these causes, which were consolidated and heard together. The issues arose over the claim of the bank against the county of Houston upon warrants of the county alleged to be held by the bank, or for money had and received by the county.

The first bill was filed on December 15; 1922 by the Bank of Erin, a Tennessee banking corporation, in its own right and in the name of the State of Tennessee on relation of the Bank of Erin seeking a writ of mandamus, requiring R. E. Roby, trustee of Houston county, to pay to the Bank of Erin out of county funds, the sum of $8189.92 in satisfaction of school warrants of Houston county, and the sum of $811.33 in satisfaction of road orders issued by road overseers of

Houston county, all alleged to have been transferred to the Bank of Erin for value in due course of trade; and also seeking a decree against Houston county for the sum of $9001.25, the aggregate amount of such warrants and orders, to be paid by proper school and road tax levies.

On April 16, 1923 Houston county filed a demurrer, which the court overruled, but leave was granted to the county to rely upon the demurrer in its answer and the bill was sustained, in so far as the demurrer was concerned, as a bill to recover on the warrants and orders.

On December 30, 1925, upon motion made and granted in open court, the Bank of Erin amended its original bill so as to show that it was suing individually and in its own right and in name of each of the several payees under the warrants and orders for its use; and so as to seek a decree, in behalf of the payees of such warrants and orders, for the use of the Bank of Erin, for the amount of the monies alleged to have been expended by the bank in the purchase of said warrants and orders.

In its answers to the original bill and to the bill as amended, the county denied that the appellant bank was the owner of said warrants and orders, and that it was entitled to recover anything from the county, upon three principal grounds, viz. (a) That these warrants and orders had been paid by checks drawn by the former trustee W. R. Boone, upon funds of the county; (b) That the requirements of sections 523 et seq., and 5378 of Shannon's Annotated Code were not observed; and (c) That the road orders showed on their face that they were not signed by the chairman of the county court and were therefore invalid.

On November 12, 1924 the county of Houston filed the other bill, seeking to enjoin the prosecution of a suit which had been instituted against it by the Bank of Erin on December 11, 1922 in the circuit court of Houston county, to recover judgment for the sum of $1460, and interest on a county warrant, originally for $2077, alleged by the bank to have been issued on October 1, 1919, but lost by the bank through theft and a duplicate thereof issued and delivered by the chairman and clerk of the county court—on which warrant two payments of $500 each had been made. This warrant was alleged by the bank to have been issued for money borrowed of it by the county.

On April 28, 1925 the Bank of Erin filed its answer and cross-bill in said cause denying the averments of the bill and the charges that the warrant was issued without authority, and that the county was not liable thereon; and seeking a decree against the county for the amount claimed to be due on the warrant as had been claimed in the suit in the circuit court. An answer to this cross-bill was filed by the county, against denying liability.

W. R. Boone was trustee of Houston county for about twenty years prior to November 1, 1921, the day of his death. For the last ten years he was a defaulter in large sums, but there is no evidence that this was known to any representative of the Bank of Erin. The transactions with the bank which gave rise to these suits had their origin in this situation. In October, 1919, the county had not sufficient money to meet its necessary expenses. This situation existed also during the latter part of 1920 and much of 1921, when the school and road warrants were issued.

We will first deal with the question of liability upon the warrant of October 1, 1919 for borrowed money. It is clear that the sum of $2077 was loaned on this warrant by the bank to the county, and two payments thereon were made, of $500 each, on July 5, 1920 and September 6, 1920, respectively. The warrant sued on is numbered 978, but it recites that it is a duplicate of No. 781 allowed by the court at its October term, 1919, and was given "on account of borrowed money." It is signed by J. R. Lee, chairman pro tem, and W. T. Pollard, clerk. The payee named in the warrant is the Bank of Erin. It purports to be a copy of an original warrant numbered 781. The cashier of the bank testified, without contradiction, that this original warrant was stolen when the bank was robbed and that he had the temporary chairman and the county court clerk to issue this as a duplicate. Houston county in its bill avers that the following stub entry as to the issuance of the original warrant 781 appears from the warrant books of the said trustee Boone:

"781. October 1, 1919.

"Pay to the Bank of Erin on account of borrowed money two thousand and seventy-seven dollars received by me."

It further alleges that during this year and at the time this money was borrowed Boone was in default in the revenue which he had collected, and that at the time of said stub entry he was indebted to the Bank of Erin, and that the minutes of the county court contained no order authorizing the borrowing of the money mentioned in said stub entry and now sued for. It averred that the county court did not in quarterly session authorize the borrowing of said sum of money, to pay for a loan made by the said bank to the said Boone claiming the right as trustee to represent the county in making such loan. It insisted that had Boone in fact made such a loan for the county under such alleged authority, no liability would have been thereby created against the county. It insisted that as a legal proposition the county court had no authority to borrow this money; that the county court has no authority to borrow money for any purpose whatever, unless specifically authorized by statute to do so—not even for the payment of appropriations which the court is authorized to make for county purposes under section 6045, and its sub-

6 T. A.—41.

sections, of Shannon's Annotated Code. The county further relied upon the requirements of the law as to warrants, contained in section 523, sub-sections 4 and 5 of said Code, requiring the trustee on presentation of warrants for payment to enter them in a book kept by him for the purpose, ruled in columns so as successively to show as to each warrant the number, payee or holder, date, day of presentation and amount of the same; and if there be any funds in the treasury not otherwise appropriated, immediately to pay the demand and take up the warrant, otherwise to deliver it to the owner with the number endorsed, and afterwards to pay it in its numerical order. It averred that none of these requirements were complied with by the trustee, or any other county official, and this fact was well known to the Bank of Erin and its officials. There is no evidence that as to any of the warrants sued on these provisions were complied with, but it does not appear that this fact was known to the Bank of Erin and its officials.

W. H. Rice, a very aged man, was chairman of the county court during the year 1919. He testified that he had no remembrance of a warrant for $2077 being authorized or issued. He said that he did not sign any warrant for $2077. He was asked and answered as follows:

"Q. Do you recall that Mr. Boone went with you to the Bank of Erin; at any time, to see anybody about some money in the year 1919? A. I reckon that was the year. Ain't certain, but I think it was. I was here one day, he just remarked that we were in the same fix we had been for several years, we had been borrowing $1000 to tide over, and said he would like for me to go down to the bank with him, and we went to the bank and explained to Mr. Rauscher that he needed $1000 and Mr. Rauscher said he would be glad to let him have it.

"Q. Did he state what fund he wanted it for? A. No, sir.

"Q. Was anything said about general, or school fund? A. Was understanding, general fund.

"Q. What did you say to Mr. Rauscher, to let him have it? A. I think I did, I think I seen a warrant in here for $1000.

"Q. There had been no order of the county court authorizing you, or anybody else to borrow any money? A. No, sir. it had not been done, but the county court was satisfied, I am sure they knew it was to be done.

"Q. But no action was taken in the county court? A. No, sir, I don't think it was. I don't remember it."

On cross-examination he was asked and answered as follows:

"Q. I will ask you if at the April term of the court, if you and Mr. Boone didn't go to the bank, and if the court didn't instruct you to go there and make arrangements to borrow this

money? A. No, sir I don't think was ever any action taken by the court. It was just expected, had been expected, and had been done by the chairman when they needed it, and I just suppose the court as a rule knew it was going to be done. Was no action taken.

"Q. I will ask you if in the morning of the term, if the court didn't discuss the financial condition of the county, and if it didn't instruct the chairman and the trustee to make arrangements with the bank to borrow some money, and about the noon hour while the court was in recess, you went down to the bank and made arrangements for the money? A. It might have been talked of, and understood by the court that it had to be done, but there was no instruction given, I don't think. I don't think I had any orders as chairman to go and do it, I think it was expected by the court for me to do it.

"Q. If the court instructed you and the trustee to make arrangements to borrow money on this occasion, it has slipped your memory, that part of it? A. Why certainly, I don't remember it. I don't think that the court ever made it, might have been requested by some of the members, that the chairman had the right to do it, I don't remember."

Mr. Rauscher, then cashier and later president of the bank, testified that the trustee W. R. Boone and the chairman of the county court came to the bank while the county court was in session and said that the county court instructed them to see if they could get any money from the bank, and the bank loaned them the money; that the warrant was issued as an evidence of the loan to the amount of $2077. He said that they said to him that the court was waiting for them to make their report and that the loan was made upon that information and the issuance of the warrant to the bank. He further said that Boone as trustee made the two payments of $500 each, which were credited on the warrant.

J. R. Lee testified that he was chairman pro tem of the county court when the duplicate warrant was issued; that he was a member of the county court at the time the original warrant was issued. He was asked and answered as follows:

"Q. Do you remember that the chairman, Esquire Rice and the trustee were instructed by the county court to make arrangements for this loan, for which this warrant was issued? A. They had a talk up there about it."

It appears that the minutes of the county court do not contain any resolution authorizing the borrowing of the money, or instructing the chairman and the county trustee to obtain the loan.

The foregoing parol evidence purporting to show that the loan was authorized by the county court was not excepted to, but it is

well settled that the action of a court or legislative body is not complete or effective for any purpose until the record evidencing it has been made and duly authenticated. "The records of courts and legislative bodies are the sole witnesses of their proceedings and they can only be proven by duly certified copies of such records. Parol evidence cannot be heard for this purpose. These are well-established rules and every principle of public policy imperatively forbids any departure from them." State v. True, 116 Tenn., 294, 313, 95 S. W., 1028, Brooks v. Claiborne county, 8 Bax., 46; Fraker v. Brazelton, 12 Lea, 280.

But the underlying proposition to be applied here is that the county of Houston had no power to borrow this money. Section 493 of Shannon's Annotated Code provides: "Every county is a corporation and the justices in the county court assembled are the representatives of the county and authorized to act for it." Section 496 provides: "Each county may acquire and hold property for county purposes, and make all contracts necessary or expedient for the management, control and improvement thereof, and for the better exercise of its civil and political powers; make any order for the disposition of its property, and may do such other acts and exercise such other powers as may be allowed by law."

It is well settled however that counties being creatures of statute, have no powers, except those created by statute, and the power to borrow money will not be implied, but must be expressly granted to authorize its exercise. 15 C. J., 573. Burnette v. Maloney, 97 Tenn., 697, 37 S. W., 689, 34 L. R. A., 541; State v. True, 116 Tenn., 294, 95 S. W., 1028; Judges Salary Cases, 110 Tenn., 370, 75 S. W., 1061; Johnson v. Brice, 112 Tenn., 59, 83 S. W., 791. In Burnette v. Maloney supra, it was held that to enable a county to issue warrants, it must derive its authority to create such a debt from an enabling act of the legislature, which at the same time gives it power to provide for payment by a special act, and no doctrine is better settled in the State than that the power thus conferred must be strictly construed and exactly followed. See also Southern Railway Company v. Hamblin County, 115 Tenn., 526, 92 S. W., 238.

There is no general statute authorizing counties to issue warrants for borrowed money, and we find no special statute authorizing Houston county to do so.

But the doctrine of implied liability is here invoked to justify a recovery of this money loaned as in assumpsit for money had and received. It is true that there are many cases holding that where an express contract of a county is unenforceable on account of some irregularity in its making or letting, recovery may be had against the county for money furnished as on an implied contract. 15 C. J., 559. But these are cases in which the municipal corporation could lawfully borrow and the objection went only to the way in

which it was done. A review of these cases is to be found in the opinion of Denison Circuit Judge speaking for the United States Circuit Court of Appeals, 6th circuit, in Eaton v. Shiawassee county, 218 Fed., 588. A leading case is Louisiana v. Wood, 102 U. S., 294, 26 L. Ed., 153, in which the trouble was with the details of a bond issue. The Supreme Court of the United States applied the rule previously announced by it in Marsh v. Fulton county, 77 U. S., 676, 19 L. Ed., 1040; "The obligation to do justice rests upon all persons, naturally or rightfully, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation." An exception to this line of cases is Bank v. Goodhue, 120 Minn., 362, 139 N. W., 599, 43 L. R. A. N. S., 84, in which the moral obligation was allowed to prevail over the legal prohibition; but in that case the municipal corporation received money from a bank under and pursuant to a contract upon a subject within its corporate powers. In Easton v. Shiawassee county this decision was held to be in conflict with Litchfield v. Ballou, 114 U. S., 193, 29 L. Ed., 132, in which it was said by Mr. Justice Miller, "If this prohibition is worth anything it is as effectual against the implied as the express promise."

In Madison county v. Gibbs, 9 Lea, 383, it was held that under code provisions authorizing the county court to appoint commissioners to contract for and have completed repairs on bridges, levees, etc., a person who performs work and furnishes material in such repair, with the knowledge and consent of the commissioners, and whose work is accepted and used by the county, may recover from the county what the work and material are reasonably worth, without an express contract by and with the commissioners. This holding was approved in Rhea County v. Sneed, 105 Tenn., 581, 58 S. W., 1063, the doctrine of implied promise to pay for benefits conferred being applied. But this rule of implied liability was based upon an original authority to make such a contract. The right to compensation under contracts which cities had the power to make, but which were irregularly entered into, was sustained in Gaslight Co. v. Jellico, 103 Tenn., 320, 52 S. W., 995; Keenan and Wade v. City of Trenton, 130 Tenn., 71, 168 S. W., 1053, Ann. Cas., 1918B, 519; and Burns v. Nashville, 142 Tenn., 541, 221 S. W., 828. The right to compensation was denied in Watterson v. Nashville, 106 Tenn., 410, 61 S. W., 782, because of a prohibition in the charter of the city against making of such a contract as that out of which the claim arose.

The rule of implied liability is therefore based upon an original authority to create the debt. It cannot be invoked where the contract was ultra vires. The authority to create the debt must first exist. See also State v. True, Rhea County v. Sneed, supra; Floyd County

v. Allen (Ky.), 126 S. W., 124, 27 L. R. A. N. S., 1125 and notes thereto; 15 C. J., 559, 7 R. C. L., 944.

We have a long line of cases in our Tennessee Reports holding that warrants and bonds issued by counties, cities or towns without legislative authority, are void ab initio and non-enforceable in whosesoever hands they may come. See 9 Michie's Digest, 376. The courts are in full harmony in holding that one who deals with a municipality in respect to a matter beyond its corporate powers can have no relief, either in law or in equity. 7 R. C. L., 944. Contracts so entered into are wholly void, because prohibited, of which all are required to take notice. The complete absence of authority is equivalent to an express prohibition.

As the county of Houston was not vested with the power to make this loan and execute its warrant for payment of the money borrowed, we are powerless to enforce any moral obligation upon the theory of implied contract to pay what it has received. In our opinion the preponderance of the evidence shows that the bank did loan this money to the county and was innocent of any complicity in the default of its trustee, and without any knowledge of it, but it is without remedy against the county.

As to the school warrants and road orders sued on other questions are presented, which will be disposed of. Very few of these warrants or orders bear the endorsements of the original payees; but they were delivered by said payees to the trustee, and if they were executed validly so as to come to the Bank of Erin as the holder, the assignments were not invalid because they were done by parol—that is, so as to pass the equitable title. In Bradley County v. Surgoine, 6 Bax., 108, it was held that the plaintiffs suing on county warrants had not shown themselves vested with the legal title by endorsement or assignment of the payees thereof, but although an assignment in writing was necessary to pass the legal title, an equitable title would pass by a parol assignment and delivery. In the absence of a statute to the contrary, a written assignment of a bill or note, whether it is negotiable or non-negotiable, is unnecessary, and an assignment by parol is sufficient. 8 C. J., 384; 5 C. J., 900, 903. A county warrant is not a negotiable instrument, but it is a written order by the proper officer upon the treasurer or trustee of the county to pay a specified sum of money to the person named thereon, or to the bearer. Although it is not negotiable it is assignable. 15 C. J., 602; 8 C. J., 384, Garvin v. Wiswell, 83 Ill., 215. The effect of an assignment of negotiable paper is to divest the legal property or interest out of the holder and vest it in the assignee. He is authorized to sue in his own name or in the name of the payee for his use. Simpson v. Moulden, 3 Cold., 429; Moore v. Weir, 3 Sneed, 46. Where only an equitable title is

passed equity will enforce it. Equity has always held that the assignment of a thing in action for a valuable consideration should be enforced. Pomeroy on Equity, 4th Ed., vol. 3, sec. 1270; 5 C. J., 848; 21 C. J., 117; 8 C. J., 824. See also the following cases: Barthol v. Blakin, 34 Ia., 452; Cleveland v. Martin, 39 Tex., 128; Smith v. Penn-American Plate Glass Co., 111 Md., 696, 77 Atl., 264; New Jersey Produce Co. v. Gluck, 79 N. J. L., 115, 74 Atl., 443; Alfalfa Lumber Co. v. Smith, 151 S. W., 204; Davis & Rankin Co. v. Caigle (Tenn. Chy. Apps.), 53 S. W., 240; Wall v. Monroe County, 103 U. S., 77, 26 L. Ed., 430.

The school warrants were all signed by the chairman and secretary of the county board of education, payable to the order of persons named therein, but were not approved by the county superintendent or the chairman of the county court or the county court clerk.

Sections 517, 518, 523, 5378 and 6047 of Shannon's Annotated Code set forth a general system under which money can be drawn out of the treasury of the county. Judges or Chairman of county courts shall draw warrants, audit and settle accounts, keep warrant and account books, etc.; and trustees shall pay just claims against the county as they are presented, etc. Sections 518 and 6047 provide that no money shall be drawn out of the treasury of the county, except upon the warrant of the judge or chairman of the county court. But as to disbursement of school funds there are other statutes. Under section 1434a1 the offices of district directors were abolished and the schools were placed under the management and control of a county board of education. Under section 1434a8 it is the duty of the secretary of the county board of education among other things, to issue all warrants authorized by the county board of education upon the trustee for the expenditures of the public school fund, and to sign the same, together with the chairman of the board. Under this section the chairman and secretary succeeded to the powers and duties of district school directors, set forth in section 1430, sub-section 12. The act creating county boards of education, sections 1434a1-18 of Shannon's Annotated Code, is chapter 236 of the Acts of 1907. Under this act warrants drawn by the chairman and secretary of the county board of education for salaries of teachers, were valid without approval by the County Judge or chairman, the county court clerk, or the county superintendent. Chapter 64, section 1 of the Acts of 1905, being section 1400a7 of Shannon's Annotated Code, provides that it shall be unlawful for the county trustee to pay out school funds upon warrants issued by district schools directors for maps, charts, libraries and other school furniture, or apparatus, unless such warrants are approved by the County Judge or chairman of the county court

and the county court clerk of the county wherein the articles are sold. Section 1416a2, taken from chapter 85 of the Acts of 1897 and chapter 410 of the Acts of 1899, provides that all such warrants shall be countersigned by the county superintendent. These provisions of the Acts of 1897 and 1899 and 1905 were not expressly repealed by the Act of 1907, and we do not find such conflict between these earlier acts and the latter act as to amount to a repeal by implication.

Certain of these school warrants show on their face that they were given for purposes other than teachers' salaries, but none of them appear to have been issued for maps, charts, libraries and other school furniture or apparatus. In our opinion these school warrants were valid prima facie. It is well established that when county warrants are regular on their face, they establish prima facie the validity of the claims allowed, and authorize their payment; but they have no other effect. Wall v. Monroe county, supra. An assignee of such warrants takes subject to the risk that they are lawful and properly issued. Dillon on Municipal Corporations, sec. 502. A person taking a warrant is bound to know the law relating thereto. Diggs v. Lobsitz, 4 Okla., 232, 43 Pac., 1069; Weil v. Newbern, 126 Tenn., 223, 148 S. W., 680.

Of course there could be no question as to power of the county, under our statutes, to contract in the proper way for services of school teachers, for school supplies, or for labor and material for construction or repair of roads. We are now dealing with claims of indebtedness which the county originally had the power to incur, though other issues are presented. But all of these road orders are irregular and invalid, for the reason that they are not approved in writing by the chairman of the county court. Further more nearly all of them are written with pencil and signed with pencil, in violation of section 1680a1 of Shannon's Annotated Code, which provides that all orders issued by commissioners of public road districts upon judges or chairman of county courts to or on county trustees for the disbursement of public road funds in payment for services rendered, or labor performed, or tools or materials furnished public road districts, and all other orders required or allowed by law so to be issued by commissioners of public road districts upon judges or chairmen of county courts, for warrants to or on county trustees, for the disbursement of public road funds, shall be written wholly with pen and ink or printed and written with pen and ink, and provided, that all such orders issued and not written wholly with pen and ink, or printed and written with pen and ink, shall be illegal and void. Section 1680a2 provides that any commissioners who shall violate the provisions of said section 1680a1 shall be guilty of a misdemeanor and shall be liable in damages to any person aggrieved.

If we should seek to apply the doctrine of implied liability, as in Madison County v. Gibbs, supra, we are met with the absence of any lawful evidence that the benefits for which these road orders were supposed to have been given were actually conferred upon the county. It would be necessary for it to appear affirmatively that the county received and retained substantial benefits in order that it should become liable in an action brought to recover the value of the benefits received. 7 R. C. L., 947; Madison County v. Gibbs, supra. The recitals in these void road orders that they were issued in payment for labor performed or material furnished cannot be taken as evidence. Such recitals by the road overseer could not be looked to as admissions binding the county. There is no evidence of a legal character that would establish the fact that the county did receive such benefits; and therefore there is nothing in the record upon which to base any application of the doctrine of implied liability upon the obligations supposed to be evidenced by these road orders.

The warrants issued by the chairman and secretary of the county board of education were, in our opinion, lawfully issued and should at all events have been paid by the county. The question now remaining is, whether they have been paid, or they are still outstanding obligations of the county. It is insisted for the county that they have been paid and that the trustee merely attempted to make a fraudulent and invalid reissuance of them.

As heretofore shown, there is no evidence of any knowledge on the part of the bank, or any of its representatives, that the trustee Boone was in default, or that the want of funds with which to pay these warrants was due to any default or embezzlement on his part. But the bank did know that these warrants and orders were being paid to the holders, and that they came into the hands of the trustee, the representative of the county, as if they were discharged. Did the trustee have then the power to keep them alive?

It appears that in settlements with the chairman of the county court or other officials, Boone got credit for all these warrants as having been paid by him; but if he perpetrated a fraud upon the county by representing that the warrants were paid, this cannot affect the rights of the bank, if the bank did not participate in it, or having knowledge of it failed to assert its claim. It does not appear that the county chairman or other officials agreeing to the settlements, when the accounts were audited, had before them these warrants showing that they were cancelled. The evidence shows that they were in the hands of the bank. Boone showed merely that he had taken up the warrants by giving his checks, but evidently the warrants were not produced. The warrants were entered on his books and he took credit for the same, showing that he had paid

these warrants by checks. Of course this was the work of a defaulter who was covering up the fact that the money used in taking up these warrants was coming from another source than the county revenue.

But the bank was not under any duty to examine into these facts, and such transactions were merely res inter alios acta.

If the bank loaned the money to the county upon faith of being or becoming a holder of valid warrants, it would be unjust and inequitable to deprive it of its right to recovery because the county trustee or the chairman of the county court did not comply with all of the provisions of the acts heretofore cited as to their fiscal management for the county. The bank was under no duty to supervise the work of the chairman, the clerk or the trustee. If the county suffered loss through the defaults of the trustee, it became a matter between the county and the trustee and his sureties. The remedy of the county was against them.

The question then is, were these transactions between the trustee and the bank of the nature of the trustee making many personal loans upon paid warrants as security, for the purpose of reimbursing the county for money embezzled by him? Did the payment of the amount of each warrant to the named payee by check upon the trustee's account in the bank amount to an absolute satisfaction and extinguishment of the obligation? Or, under the facts shown, did the bank become the lawful owner and holder of these warrants? Is it entitled to subrogation to the rights of the original payees?

The evidence of the acquisition of these warrants by the bank rests almost entirely upon the testimony of Mr. Eric Rauscher, then its cashier, who had these transactions with Boone, the trustee. His testimony is as follows:

"Q. Now in the bank's original suit against Houston county on the school and road warrants for $9001.25, was filed December 15, 1922? A. Yes, sir.

"Q. I will hand you these warrants, school and road warrants and will ask you how the bank came in possession of those warrants? A. We bought some of them over the counter from the parties holding them, and then I believe that Esq. French and Hall said there was some question about some road warrants outstanding being paid, so we quit taking any kind, without an understanding with the trustee, that we would pay his checks, and he would turn the warrants over to us, that is the way we got them, except the ones we bought over the counter.

"Q. At the time or during the time those warrants were being taken by the bank state if W. R. Boone, had funds as trustee of the county, with which to pay these warrants. A. No

these checks coming in for warrants was an overdraft, on his accounts, and when the warrants would be turned over to us we would credit his account from time to time.

"Q. Did you take these warrants from him and credit his account as though cash had been deposited with you? A. Yes, sir.

, "Q. Was that arrangement and understanding made at the time you commenced taking these warrants? A. Now understand that we bought some of the warrants from people who held them, until we got this information from Esq. French and Esq. Hall, and after that all came through the trustee.

"Q. At the time did you have an understanding with him with reference to drawing checks, for holders of the warrants, and what disposition would be made of the warrants? A. Yes, sir.

"Q. What was this? A. Understanding was that all of the warrants the bank, took in, or all we would take—would take care of with his checks, unless there was some a question was raised about, of course he was not to take them.

"Q. What was the agreement at the time with your bank and the trustee about you taking these warrants and entering them on his account as credits? A. When the warrants were turned into us we would credit his overdraft.

"Q. After that arrangements was made have you any way of telling how many of these warrants were purchased over the counter, by you and the amount delivered to you by the trustee? A. I cannot. They were mixed up together and no record of them kept separately. We had a warrant account and when the trustee would bring them in we would charge it up and give credit against his overdraft.

"Q. You allege in your original bill that $811.35, of the $9001.25 was road warrants? A. I assume that is correct.

"Q: And $8189.92, of them are school warrants? A. Yes, sir.

"Q. You know whether that is correct or not? A. Yes, I listed them."

The record before us contains all the original warrants and the checks given by Boone to the payees thereof. It also contains a statement by an accountant showing respectively the dates of checks given by Boone therefor. It appears that the respective dates do not always correspond with each other; nevertheless it is clear that there was an agreement that the money would be advanced or loaned by the bank and passed to the credit of the account of the trustee, only upon faith that the warrants should be turned over to and held

by the bank. It is clear that the bank would not have honored these checks of the trustee without such an agreement.

The defense made by the county is not against the original payees. The county owed them the money. There was no fraud by them nor want of consideration for the warrants. The county insists, and the Chancellor appears to have held that these warrants were paid and extinguished when the checks given in satisfaction of them were honored by the bank; and that the warrants cannot be considered as having been alive after such dates of payment.

The rule is universal that where payment of a bill or note had been made at maturity, or after maturity by the maker or the acceptor, the instrument is discharged, and ordinarily cannot be reissued so as to charge any party thereto who otherwise would be discharged without his knowledge or consent. 8 C. J., 591; 3 R. C. L., 1272. In Richardson v. Marshall County, 100 Tenn., 345, 45 S. W., 440, it was held that bonds which had once been paid and cancelled and afterwards stolen and sold, were null and void, utterly dead and incapable of revitalization by theft and fraudulent recirculation. Section 119 (5) of the Uniform Negotiable Instruments Law provides that even a negotiable instrument is discharged when the principal debtor becomes the holder of the instrument at or after maturity in his own right. When these school warrants and road orders were paid by the trustee to the persons named therein as payees, they were discharged so far as the payees were concerned. The trustee then held them for the county as paid obligations. He had no power then to undertake to keep them alive. He could not bind the county by an agreement to borrow money, for as hereinbefore shown, the county had no power to borrow money in this way. He was without power to enter into an agreement with the bank in behalf of the county for a subrogation of the bank to the rights of the original payees. As a person taking a warrant is bound to know the law relating thereto, the bank was charged with knowledge of this want of power in the trustee. Therefore, although it parted with the money, it cannot be regarded as the owner and holder of these as live and valid obligations. These rules were applied in Chemung Bank v. Board of Supervisors, 5 Denio (N. Y.), 517. The facts of that case were similar, in some particulars, to those of the case before us.

Public policy, as well as the rules thus set forth, would forbid upholding such transactions as valid; for it would make it possible for a defaulting public officer to perpetrate theft by the wholesale and involve a county in debt with scarcely a limit.

It is unfortunate that through over-confidence and ignorance of the law the bank should incur this loss, but for the reasons given, in

our opinion, there is no error in the decree of the Chancellor and it is affirmed. The costs of the appeal will be adjudged against the appellant and the surety on its appeal bond.

Faw, P. J., and Crownover, J., concur.